O'DONNELL, RESPONDENT, v. CITY OF BUTTE, APPELLANT.

(No. 4,920.)

(Submitted November 28, 1922. Decided December 21, 1922.)

[211 Pac. 190.]

*Personal Injuries—Cities and Towns—Streets—Defective Cross-walks—Extent of Duty of Municipalities—Burden of Proof—Evidence—Insufficiency.*

Personal Injuries—Streets—Defective Crosswalks—Snow and Ice—Duty of City.
1. As a general rule, a city or town is not held to as strict an accountability for permitting ice and snow to accumulate on a cross-walk as it may be for a like accumulation upon a sidewalk, and a greater degree of proof is required of one trying to fasten liability for injuries sustained by a fall on the one than on the other.

Same—Icy Crosswalks—Degree of Obligation of City.

2.    While primarily it is the duty of a city to exercise active vigilance to keep all of its streets in a safe condition suitable for public use, that duty is met by a reasonable performance of it.

Same.

3.    What amounts to reasonable care and diligence in keeping the crosswalks on city streets clear from snow and ice depends upon the circumstances of each particular case, more care and diligence being required where the danger is great and obvious than where it is slight.

Same—Liability of City—Evidence must be Clear.

4.    To hold a city liable for neglect of its duty to keep its streets and walks so clear of snow and ice as to prevent personal injuries from falling thereon, the evidence must be clear.

Same—Crosswalks—Dangerous Obstruction—What Constitutes.

5.    A city is under no duty to keep its street crossings clear of snow and ice, and is not liable to one injured by slipping thereon, unless the condition caused thereby constitutes a permanent, unusual or dangerous obstruction to travel, and the mere fact that a street of unusual slope or construction is slippery, by reason of a smooth coating of ice from whatever cause, does not constitute a defect or condition for which it may be held liable.

Same—What Constitutes Dangerous Obstruction of Crosswalk by Snow or Ice.

6.    Before snow or ice on a crosswalk may be said to constitute an unusual or dangerous obstruction or an interference with travel, for injuries caused by which a city may be held liable in damages, it must have been suffered to accumulate in ridges, or in irregular or uneven forms or heaps, in such manner that a pedestrian exercising ordinary care cannot pass over it without danger of falling.

Same—Evidence—Insufficiency.

7.    Evidence *held* insufficient to show that the icy condition of the crosswalk where plaintiff fell was occasioned by neglect of duty on the part of defendant city or was of such character as to have constituted an unusual or dangerous obstruction.

Same—Defective Crosswalk—Burden of Proof.

8.    The presence of snow and ice in a rough, jagged or uneven condition at a crosswalk where owing to street traffic lumps or ridges may form with alternate thawing and freezing is not alone sufficient to fasten liability upon the city for injuries sustained by falling thereon, it being incumbent upon plaintiff to show the extent or degree of the slanting or uneven condition, the length of time it had existed so as to charge it with notice, actual or constructive, and the weather conditions at or prior to the accident.

Same—City not Insurer—Negligence—Burden of Proof.

9.    A city is not an insurer against accidents on its streets, and to entitle a person injured to recover damages he has the burden of showing that the city failed to perform a duty resting upon it by proof showing more than mere conjecture or surmise.

---

6.    Liability of municipality for injuries from snow and ice on crosswalks, see notes in **Ann. Cas,** 1913C, 1068; 21 **L. R. A.** 263; 20 **L. R. A.** (n. s.) 513; 39 **L. R. A.** (n. s.) 1167.

Liability of municipality for injuries from snow and ice on sidewalks, see note in 13 **A. L. R.** 17.

*Appeals from District Court, Silver Bow County; Joseph R. Jackson, Judge.*

ACTION by Catherine C. O'Donnell against the City of Butte. Judgment for plaintiff, and defendant appeals from it and an order denying it a new trial. Reversed and remanded.

*Mr. J. O. Davies, Mr. M. J. Cavanaugh* and *Mr. D. H. Wittenberg,* for Appellant, submitted a brief; *Mr. Davies* argued the cause orally.

Appellant contends that it requires much stronger evidence to make the city liable for an injury happening on a crosswalk than it does where the injury takes place on a sidewalk proper; that in the very nature of things there must be a different rule. Streets are graded and improved primarily for the use of vehicles, whether self-propelled or drawn by horsepower, and in cities such as the appellant, where sleighs and vehicles of such nature are still in common use during the winter season, a city has no right to remove snow from its streets, even where used by pedestrians, as such removal would make it impossible for vehicles traveling upon runners to use streets cleaned of snow, even at the crosswalks, and we contend that the courts generally recognize this distinction and lay down an entirely different rule governing the city's liability for an injury upon a crosswalk. (See 6 McQuillin on Municipal Corporations, sec. 2794; *Dupont* v. *Port Chester,* 204 N. Y. 351, Ann. Cas. 1913C, 1066, 39 L. R. A. (n. s.) 1167, 97 N. E. 735; *Egan* v. *City of New York,* 161 N. Y. Supp. 849, 175 App. Div. 358; *McKeiler* v. *City of Detroit,* 57 Mich. 158, 23 N. W. 621; *Brennan* v. *New York,* 114 N. Y. Supp. 578, 130 App. Div. 237; *Comstock* v. *Schuylerville,* 124 N. Y. Supp. 92, 139 App. Div. 378; *O'Shaughnessey* v. *Middleport,* 86 N. Y. Supp. 944, 93 App. Div. 93; *Mauch Chunk* v. *Kline,* 100 Pa. 119, 45 Am. Rep. 364.)

*Mr. Wm. Meyer* and *Mr. N. A. Rotering,* for Respondent, submitted a brief; *Mr. Meyer* argued the cause orally.

The record discloses that the crosswalk upon which the respondent fell and where she sustained her injuries is one of the principal crosswalks of the city of Butte; that it is in the heart of the city; that the ice extended from the point where respondent fell clear up to the curb along the east side of Hamilton Street; that it lay there for at least two or three weeks, one witness saying that it was there all winter; that a catch-basin maintained by the appellant for the handling of surface waters was clogged for some time, causing the waters to remain upon the crosswalk and to form the dangerous accumulation of ice; and that the icy accumulation and obstruction so formed was rough, uneven, slippery and slanting. The authorities upon which the appellant relies are not in point, because in every one of them the icy condition was caused by the weather alone, and such condition was of recent origin and the accumulation of ice was not caused by any clogged-up catch-basin or by any other act for which the municipality was responsible.

The legislature has delegated to municipal corporations the authority and duty of providing for crosswalks. (Subd. 8, sec. 3259, Rev. Codes.) Since authority to provide for crossings has been given to the city council, it is the duty of the city council to maintain any crossings established by it in a reasonably safe condition for travel by the public. (*Piper* v. *City of Spokane,* 22 Wash. 147, 60 Pac. 138; *Town of Belleview* v. *England* (Ky.), 118 S. W. 994; *Holbert* v. *City of Philadelphia,* 221 Pa. 266, 20 L. R. A. (n. s.) 201, 70 Atl. 746, 747.) The case last referred to holds that a city must keep its streets in a reasonably safe condition and must exercise the same duty as to them that it must exercise as to its sidewalks. The opinion states that the streets including the sidewalks must be kept in a reasonably safe condition. (*Magaha* v. *Mayor etc. of City of Hagerstown,* 95 Md. 62, 51 Atl. 832.) In the case at bar the appellant had full con-

trol over the catch-basin. Under the evidence it is not only a fair but likewise a necessary inference that the ice upon the crosswalk was formed from the waters which could not flow into the catch-basin by reason of its clogged-up condition. The appellant was, therefore, the one which had caused the ice to form; at least it was responsible for said ice having formed, and it was liable for the injuries caused thereby. (*Decker* v. *Scranton City,* 151 Pa. St. 241, 25 Atl. 36.)

That the municipality will be liable for injuries caused by ice which was formed by reason of an obstructed gutter or catch-basin is indicated by the head-note of a Connecticut case. "The failure of city authorities to clean out a gutter which has become improperly obstructed so that it fails to carry off water resulting from the melting snow piled between the sidewalk and the curb of the street, within a reasonable time after due notice that the melting of snow permits the formation of ice from day to day on the sidewalk, renders the city liable for injuries occasioned by slipping on ice which had thus formed upon the walk." (*Gaylord* v. *City of New Britain,* 58 Conn. 398, 8 L. R. A. 752, 20 Atl. 365.) That the same rule applies alike to sidewalks, footways and crosswalks is indicated at 28 Cyc. 1373, for the author there discusses the law applying to all three under the same head. (*Blackmore* v. *City of Council Bluffs,* 189 Iowa, 157, 176 N. W. 369; *Snyder* v. *Town of Chinook,* 48 Mont. 484, 488, 138 Pac. 1090; *Snook* v. *City of Anaconda,* 26 Mont. 128, 66 Pac. 757.) The streets of a city include the crosswalks as well as the sidewalks, and under the Montana rule it is, therefore, the duty of the city to keep the crosswalks, at least where there is much travel, reasonably safe for use by pedestrians.

MR. JUSTICE FARR delivered the opinion of the court.

Plaintiff, a girl, then about twenty-one years of age, some time between 5 and 6 o'clock on March 1, 1920, in returning home from her work as an office clerk, accompanied by her sister, was walking east on the north side of Broadway Street, in the city of Butte, and in crossing Hamilton Street at its

intersection with Broadway, slipped and fell, breaking her leg. She brought this action to recover damages for the injuries sustained by her. From a verdict in her favor for $10,000 and the judgment entered thereon, the defendant appeals to this court.

Defendant, by specification of error, questions the sufficiency of the evidence to sustain the verdict.

The complaint, the sufficiency of which is not here questioned, charges that the defendant city on the day of the accident, and for more than five days immediately preceding, "did negligently, carelessly and knowingly * * * allow and permit snow and ice to accumulate and remain on the said crosswalk along the northerly side of said Broadway across Hamilton Street, and especially at a point about seven feet from the curbing along the sidewalk on the east side of Hamilton Street, the surface of which said accumulation of snow and ice during all of said time was rough, rounded, rigid, uneven, slippery and slanting."

It is also alleged, in substance, that Hamilton Street, as it approaches Broadway Street, has a considerable downgrade, and that during the middle of the season the snow and ice thereon frequently thaw and melt, and the waters therefrom drain down and upon the crosswalk; and that during the period of time referred to in the complaint the snow and ice were frequently melted and thawed and waters therefrom were permitted to run down, and over, and upon, the accumulation of snow and ice upon the crosswalk and by subsequently freezing the danger to pedestrians in crossing and using the crosswalk became great; that it was the duty of the city to remove said condition or prevent the same from continuing to exist; that the defendant and its officers knew, or in the exercise of reasonable care and diligence should have had knowledge, of said condition; and that they failed and neglected to remove the same, and, at the time of the happening of the accident to the plaintiff, the crosswalk was in the condition described, and had been in such condition for a period of more than five days immediately prior thereto.

[65 Mont. 463.]

It should be kept in mind that at this particular street crossing, so far as the surface of the street is concerned, there is nothing to distinguish that portion used by the public in crossing from one side of the street to the other, from other parts of the street. The crossing was a portion of the street pavement, as is now common in cities having paved streets. The pavement was the kind known as "Bitulithic," described as a smooth, black surface pavement in appearance. At each corner of the street intersection is a catch-basin, to catch the water coming down the streets. While some of the plaintiff's witnesses speak of the street as being "slanting" at this particular crossing place, we think it fairly inferable from the evidence that the "slant" was not very pronounced. The commissioner of public works gives the most intelligent testimony as to its grade, although his evidence is not as clear or definite as it would seem it might have been. He testified that the grade up into Hamilton Street is slight to the south and nearly level east and west; "that the gutters are lower than the center and the pavement is higher in the center." This street intersection is in the business district of the city and the traffic at this point by pedestrians and by vehicles is heavy.

Plaintiff, testifying in her own behalf, in referring to the accident, says that "After going about three-quarters of the way there was an accumulation of dirty, black, thick ice, very *rugged.* * * * As I was crossing and as I reached almost the east side of the crossing my foot slipped from under me. When my foot slipped from under me, it went clear back; my whole body fell back; the back of my head struck the ground. As I was lying on the ground my left leg was bent under me."

This is the only reference made by the plaintiff in her testimony to any ice, and it is to be observed that neither she nor any of her witnesses make any reference to any snow on the ice at or near the point where she fell.

Howard M. Rich testified for plaintiff that at about 5:15 that evening, while walking on the east side of Hamilton Street toward Broadway, he saw the plaintiff and her sister crossing Hamilton Street and saw plaintiff fall; he being at the time

about fifty to 100 feet distant. In referring to the place where she fell and to the ice, he testified on direct examination as follows: "I should say that Miss O'Donnell fell seven or eight feet from the curb on the east side of Hamilton Street. * * * The condition between the curb and the place where Miss O'Donnell fell was a big heap of ice. * * * Upon the crosswalk, according to my best recollection, there was about three inches of ice. The condition of the ice was very smooth in places and jagged in others. By jagged I mean rough ice, *smooth nature.* It was upon that ice that Miss O'Donnell slipped and fell. Miss O'Donnell was on the crosswalk when she slipped and fell. * * * I observed the crosswalk on which Miss O'Donnell fell prior to the time she fell. I observed it with reference to ice conditions prior to the time she fell. I know that the ice upon which Miss O'Donnell fell had been there practically all winter, some ice. * * * That ice was there, with reference to March 1, 1920, at least two or three weeks to my knowledge. The condition of the ice where Miss O'Donnell fell and its condition between there and the curb was smooth in some places and a little jagged in others, *making it in general a smooth ice.* I mean a slippery surface. * * * I said before it was a smooth surface at that place. Q. What do you mean? Was it thicker in some places than others, or was it the same thickness? A. It was thicker in places. It was a slippery place there. I should judge a little thicker. Q. You mean the ice was uneven and slippery? A. Yes. * * * I said before that the way I saw the condition of the ice upon the crosswalk as it extended from the east side of Hamilton Street to the west side of Hamilton Street was of a smooth nature at that place. * * * I don't recollect whether it was snowing that day or not. There was no snow on this ice at that time. Just a smooth, slick surface. I don't remember anything about the precipitation or moisture that day in the form of snow. I don't recollect whether it had snowed or not."

Plaintiff's sister, Dora O'Donnell, who was accompanying her at the time, testified relative to the place of the accident

[65 Mont. 463.]

and to the ice, on direct examination, as follows: "We were walking over that crosswalk very slowly. She slipped and fell and her knee went under her. She slipped on the ice. When my sister slipped and fell, we were seven or eight feet west of the curb on the east side of Hamilton Street. When my sister slipped and fell, I would imagine there was about four inches of ice or the ice was four inches thick where she slipped and fell. That ice was dirty, black ice, rough, very slippery and uneven, thicker in some places than others. * * * I had seen that crosswalk * * * three or four weeks before the first day of March, 1920. During that time it was in about the same condition it was when my sister fell. It had been in that condition at least two weeks, probably more. The ice extended from the point where my sister fell clear up to the curb of the sidewalk on the east side of Hamilton Street. * * * It was higher in some places than others because the crossing is slanting. By that I mean there is a grade to the south, going down." On cross-examination she said: "I think it was freezing and thawing during that period. There was a great deal of traffic along there. * * * The ice was uneven. It was slippery ice. I don't know what made it uneven. I don't remember that it snowed that day. I am quite sure the sidewalks were clear. I know there was no snow on Hamilton Street at that time. It was a wonderful day, but I don't know whether it was thawing or freezing at the time we went over there. There was no water running down across the street that I remember. I don't know whether I would remember whether there was or not. * * * Describing how she fell, she simply slipped on the slippery ice and her leg went under her; her head went back and hit the pavement, flat on her back. Her leg someway got twisted up. I don't know how her leg slipped. * * * " On redirect examination she said: "We were on the crossing proper, in the middle. I can't really remember whether it was freezing or thawing on that particular day. It must have been thawing previous to the first day of March in order to leave the ice. The water

from the melted snow immediately north of the crossing would come over the crossing, because that is a slanting street.''

Hazel Frances Keefe, who was employed in the business establishment situate on the northeast corner of Broadway and Hamilton, testified on direct that ''I had occasion to observe this crossing between the east and the west side of Hamilton Street, as I passed there every day on my way to work. I observed it prior to March 1, 1920. I know that on the day Miss O'Donnell fell it was slippery and terribly icy. The place where the water runs into the corner had been stopped up. It had been thawing previous to that and the ice had accumulated very thick. That condition had existed at least three weeks previous to March 1, 1920, in this same condition, icy.''

On cross-examination: ''The ice was thick in places and thinner up above. At the end it was even with the sidewalk. Further up it was slanting. * · * * The surface, down where the crossing was, was kind of slippery and smooth. Where the water would come down and freeze it would be thicker. That was on the crossing where people crossed, right between the east and west side of Hamilton Street. * * * I had no occasion to examine the place where she fell. *I don't know just where she fell.* This drain I speak of is right in front of Rosenstein's. There is one on the other corner; two catch-basins. The catch-basin in front of Rosenstein's is right up against the sidewalk. It is at the corner of Broadway and Hamilton. The water naturally flowed down the east side of the curb. * * * It didn't get in that corner; it was stopped up. I guess it would if it was working. It is a fact that the street is higher in the center than at the curb. It is slanting. The water naturally follows the curb. That was true at the time. To my recollection March 1, 1920, was a nice day. It was not thawing. There was no water running.''

On redirect examination: ''What impressed me that the walk was slippery was that I had seen two or three people fall there. They were falling there every day; every one that

[65 Mont. 463.]

passed there. Not every one but two or three different people, I remember, fell.''

W. H. McNulty, a witness for the plaintiff, testified on direct examination: ''During every day in the month of February, 1920, I saw the crossing on the northerly side of Broadway Street between the sidewalk on the west side of Hamilton Street and the sidewalk on the east side of Hamilton Street. My recollection of it would be that snow and water had gone down on the crossing and it was slanting. That water flowing down on the crossing had formed ice there. I really could not say how thick that ice was. The condition of the surface of that ice was naturally slippery and slanting. * * * I refer to the water flowing down the street that formed this ice. I would say that the ice was thicker northerly. On the crossing I would not say how thick the ice was. It was slanting. There was ice there, without doubt, and slanting. I just could not recall how long that ice had existed there. I think the condition existed for two or three weeks.'' On cross-examination: ''I would say that ice was slippery. Could not say exactly smooth surface. Due to conditions, it might be slippery one day and another day might be a little rough. I don't remember what the condition was on March 1, 1920. I don't remember the condition of the weather on that day.''

It was the city's contention that the foregoing evidence does not disclose any breach of any legal duty on its part, from which legal liability is created in the plaintiff's favor because of the injuries sustained by her. This court has had before it several cases involving injuries sustained on sidewalks by reason of snow and ice thereon, and as to the liability of a municipality growing out of an injury so sustained the law may be considered as fairly well settled in this state.

Defendant claims, however, that a municipality is not, and [1–3] in the nature of things cannot be, held to as strict an accountability for permitting ice and snow to accumulate on a crosswalk as it may be for a like accumulation upon a sidewalk, and we think this to be the general rule. (McQuillin on Municipal Corporations, sec. 2794; *Egan* v. *City of New*

*York,* 175 App. Div. 358, 161 N. Y. Supp. 849.) Primarily, of course, it is the duty of every municipality to exercise active vigilance to keep all of its streets in a safe condition suitable for the public use, but it can be held only to a reasonable performance of this duty. It would be a great hardship, and involve ruinous expense, if all of the city's streets subject to being affected by winter's storms are to be constantly watched and diligently kept in a thoroughly good condition. No amount of diligence can supply an adequate force or adequate means to prevent the inevitable accumulation of snow during winter storms, or the occurrence of ice during the period when it is alternately thawing and freezing.

The rule and the reason for it, in not applying such a high degree of duty in regard to snow and ice on crosswalks as on sidewalks, is well stated in *Brennan* v. *City of New York,* 130 App. Div. 267, 114 N. Y. Supp. 578, as follows: ''The claim is that the plaintiff slipped on hard or packed snow or ice on the crosswalk. It is not enough to show snow or ice to show that the city was negligent. In this variable winter climate of ours, falls of snow, followed by rain, or by thawing, and then by freezing, and so alternating from day to day, are common. The city is in no way responsible for such conditions; nor is the impracticable duty put upon it of keeping the streets free of such snow and slush. This general condition all over the city is the work of nature, and cannot be guarded against. But if the city should negligently suffer snow and ice to remain and accumulate in a particular place, until it became of a permanent nature, and a dangerous obstruction to pedestrians, then it would be liable, and this is the measure of its liability.''

In the case of *Dupont* v. *Port Chester,* 204 N. Y. 351, Ann. Cas. 1913C, 1066, 39 L. R. A. (n. s.) 1167, 97 N. E. 735, the court said: ''There is a difference in the duty of a municipality regarding the care of sidewalks, used wholly by pedestrians, and crosswalks, or places where people cross over streets which are used in winter with teams. * * * Even if the entire removal of snow from a crosswalk is desirable

for its use by pedestrians, the ordinary travel upon a street necessarily carries more or less snow upon the crosswalk, and when it thaws and freezes with the varying temperature it would be quite impossible, except by continuous effort, to keep crosswalks or crossings wholly free from snow and ice. We repeat that the obligation resting upon a municipality to keep its sidewalks free from snow and ice does not, in the absence of express provision of statute, apply to the same extent to a crosswalk or crossing on a public street.''

An examination of the reported cases discloses that the distinction made is not so much in the character of the snow or ice formation—although that is an important element—as it is in the degree of care and vigilance required on the part of the municipal officers or employees, charged with the duty of keeping its streets free from snow and ice, and what constitutes a breach of that duty for which the city will be liable in damages to an injured party, and the amount or degree of proof required in order to fasten liability on the municipality. What amounts to reasonable care and diligence depends upon the circumstances of any given case. Where the danger is great, obviously more care and diligence would be required than where it is only slight. Many cases might be cited illustrating the necessity for requiring a greater degree of proof by one endeavoring to fasten liability upon a municipality for injuries sustained by slipping and falling on a crosswalk, than on a sidewalk. It is universally held that the evidence of [4] neglect of municipal duty should be very clear in order to hold the city liable for injuries caused by snow or ice. (*Pomfrey* v. *Saratoga Springs,* 104 N. Y. 459, 11 N. E. 43; *Egan* v. *City of New York, supra.*) In the latter case it was said that ''the evidence of negligence must be extraordinarily strong.'' In 39 L. R. A. (n. s.) 1167, and in Ann. Cas. 1913C, 1066, in reporting *Dupont* v. *Port Chester, supra,* are exhaustive notes and a collection of the cases.

It may be stated as a general rule that a municipality is [5] under no duty to keep its street crossings clear of snow and ice, and unless the condition caused by the snow or ice

constitutes an unusual or a dangerous obstruction to travel, of
a permanent nature, a municipal corporation is not liable to
a pedestrian slipping on ice or snow on a street crossing and
sustaining injuries. (*Williams* v. *City of New York,* 214 N. Y.
259, 108 N. E. 448.) And the mere fact that a street, of an
unusual slope or construction, is slippery by reason of a smooth
coating of ice, from whatever cause arising, does not constitute
a defect or such a condition for which a city or town is liable.
(*Pinkham* v. *Topsfield,* 104 Mass. 78; *Mauch Chunk* v. *Kline,*
100 Pa. 119, 45 Am. Rep. 364; *Stone* v. *Hubbardston,* 100
Mass. 49.)

What condition of snow or ice constitutes an unusual or
[6] dangerous obstruction, as this phrase is frequently em-
ployed in the decided cases, is held to be that condition which
exists when the snow or ice is suffered to accumulate in ridges,
or in irregular or uneven forms or heaps, in such a manner
that a pedestrian in the exercise of ordinary care could not
pass over it without danger of falling; in other words, in such
a manner as to constitute an interference with travel. (*Mc-
Kellar* v. *City of Detroit,* 57 Mich. 158, 58 Am. Rep. 357, 23
N. W. 621; *Brennan* v. *New York,* 130 App. Div. 267, 114
N. Y. Supp. 578; *Comstock* v. *Schuylerville,* 139 App. Div.
378, 124 N. Y. Supp. 92; *Mauch Chunk* v. *Kline, supra.*)

In the case of *Williams* v. *City of New York, supra,* the rule
is well, and we believe correctly, stated, as follows: "In order
to render a municipality liable in this class of cases, the inter-
ference with travel must be, (1) dangerous, (2) unusual or
exceptional, that is to say different in character from condi-
tions ordinarily and generally brought about by the winter
weather prevalent in the given locality."

Applying these principles to the facts of the case at bar, we
[7] think that the evidence is insufficient to fasten any legal
liability on the city for the unfortunate accident to the plain-
tiff and the injuries sustained by her: First, because it is not
shown that the ice at the point where the plaintiff slipped
and fell was occasioned by any neglect of duty on the part of
the defendant city; and, second, because the character of the

[65 Mont. 463.]

ice upon which she fell does not appear to have constituted an unusual or dangerous obstruction.

The point where the plaintiff fell is definitely fixed as being seven or eight feet west from the east curb of Hamilton Street, on that portion of the street used in crossing from one side of the street to the other, which would be in a direct line with the sidewalk on the north side of Broadway. The only testimony directed to the cause of any ice near that crossing is that of the witnesses Dora O'Donnell, Miss Keefe and Mr. McNulty. The witness Rich did not testify as to the supposed cause of the formation of the ice either at the point where plaintiff fell or between there and the sidewalk. Plaintiff's sister, Dora O'Donnell, says, in effect, that it was alternately freezing and thawing and that "the water from the melted snow immediately north of the crossing would come over the crossing because that is a slanting street." According to Miss Keefe, the drain in the catch-basin on that corner was stopped up, and by reason of that the water, the result of thawing, had followed the curb down into the catch-basin until "ice had accumulated very thick," but she does not say just where this was or that this particular ice extended over the crossing. McNulty does not testify to the drain being stopped up, but he says that water had flowed on to the crossing and formed ice there.

There is not anything in the testimony of Miss Keefe to show that the ice which she says accumulated at the catch-basin was the ice on which plaintiff fell or had anything to do with the ice on which she fell. She says she does not know where plaintiff fell and she does not testify how far the ice, which she says was formed by reason of the drain being stopped up, extended westward. Neither does McNulty tell how far westward on the crossing the ice referred to by him extended. Was all the ice from the point seven or eight feet distant westward from the curb caused by the stoppage of the drain? Only by inference could that be said, and we do not think that either a court or a jury would be warranted in

drawing any such inference from the evidence of these witnesses.

If the crossing at the point where plaintiff fell was coated with ice formed from natural causes, and which the city could not reasonably be required to remove and was not required to remove, no liability attached, and it is immaterial that farther east on the same crossing ice had negligently been permitted to accumulate. The complaint does not charge that the ice was caused to accumulate on the crossing by reason of the drain in the catch-basin becoming clogged, nor can it be said from the evidence that the ice upon which the plaintiff slipped and fell was in any manner the result of the stoppage of the drain.

Further, what was the nature of this ice formation referred to by Miss Keefe and Mr. McNulty? Miss Keefe says that the ice was thick in places and thinner up above. "The surface down where the crossing was, was kind of slippery and smooth. Where the water would come down and freeze it would be thicker." There is nothing in this to indicate an unusual or dangerous condition of the ice, outside of its mere slipperiness, and, as has been observed, *supra*, a mere smooth coating of ice does not in itself constitute a dangerous condition. It cannot be told what she means by saying that the ice was thick in places and thinner up above. It would be both unfair and unreasonable to infer from this that the surface of the ice was uneven. In fact, her testimony would seem to indicate the contrary and that the surface of the ice was slippery and smooth. It would be the more reasonable and natural inference to be drawn from her testimony, as to the difference in thickness of the ice, to say that during the periods of thawing the water had sought a natural level, and, when it froze, the formation caused by the freezing was that same way, higher and thicker at the catch-basin where it accumulated, and thinner, as of course, northward along the curb on Hamilton Street, for the natural elevation of the street was higher to the north; the slope being slight from the north to

the south.   And for the same reason we think it is reasonable to assume that the ice next to the curb would be thicker than that farther westward, for the surface of the street next to the curbing was lower than at any other point.   That the difference in thickness of the ice was due to the natural street slant towards the curb and south is indicated by the testimony of Dora O'Donnell when she says in referring to the ice: "It was higher in some places than others because the crossing is slanting." McNulty's testimony is of but little value in any event, because he says the condition of the ice was constantly changing, and he did not know its condition on the day of the accident.

What has just been said relates more particularly to the condition of the ice as testified to by Miss Keefe and Mr. McNulty; and, as has been previously pointed out, it cannot be said from their testimony that the ice to which they refer was the same ice upon which the plaintiff fell, or that the ice upon which plaintiff fell resulted from the stoppage of the drain in the catch-basin.

As referring to the condition of the ice at the exact point where plaintiff fell is the testimony of Rich.   On his direct examination he says that where plaintiff fell "was a big heap of ice," and again that "there was about three inches of ice. The condition of the ice was very smooth in places and jagged in others.   By *jagged I mean rough ice, smooth nature,"* and again, near the conclusion of his testimony, he says: "There was no snow on the ice at that time, just a *smooth slick surface."* We do not think that it can be said from his evidence, taken as a whole, that the ice had any other than a smooth, slippery surface.   With the many contradictory and uncertain statements therein, it certainly is of no probative value as establishing a dangerous, unusual or exceptional condition of the ice.   To give this testimony the effect for which plaintiff contends, a court or a jury would have to indulge in conjectures or speculations.

The words "slanting," "jagged," "rough," "uneven" or "slippery," standing alone and in themselves, are of but little,

[8] if any, assistance in describing a condition of ice or snow. In themselves, as employed in describing a condition, they are only relative terms, and, except by comparison, they are not of much value as proof of the facts in a case of this kind. An examination of the decided cases will disclose that, in almost every instance where a municipality has been held liable, the evidence has shown to what extent or degree the snow or ice was slanting, jagged, rough, uneven or slippery. The court or jury was not left to surmise or conjecture as to the condition. Even though the ice was uneven or jagged, that alone would not be sufficient to make the city liable. Upon a crosswalk where vehicles, horses and people pass and repass in weather when the snow or ice is soft, lumps and ridges are likely to form which will harden when frozen, and for which the municipality will not necessarily be responsible. (*Comstock* v. *Schuylerville,* 139 App. Div. 378, 124 N. Y. Supp. 92.)

But in addition to the deficiencies in the plaintiff's proof already referred to, we do not think it can be said from the evidence how long this ice in the condition it was in at 5 o'clock or thereafter on the evening of March 1, the day of the accident, had existed prior thereto, so as to have charged the city with notice, actual or constructive, and to have imposed a duty upon it to have it removed. We do not think it can be said when the particular ice upon which plaintiff fell had formed. While it is in evidence that this crossing had been in an icy condition for a considerable period of time, it also appears that the ice was due to weather conditions and to it alternately thawing and freezing. All the witnesses agree that the ice was formed by reason of the variable weather conditions. But it cannot be said from any of the testimony on just what day previous to the accident the last thaw occurred. Was it one day or two weeks before? The jury was left to surmise or conjecture when. We think from anything that appears in the evidence, it may possibly have been thawing that day, and then froze toward evening. It is to be noted in this connection that no express or specific evidence as to

the character of the weather on, or prior to, the day of the accident was given. While either party, no doubt, could have produced evidence showing definitely and clearly the weather conditions during this period, the burden of proof was on the plaintiff to establish a breach of a legal duty by defendant, and, as has been noted, one of the governing elements, in a case of this kind, is the condition of the weather at, or just prior to, the time of the accident. Indeed, from the very fact that the ice was smooth and slippery, we think it more probable that it had only recently formed as a result of a recent freezing. The probability is that ice, seven or eight feet from the curb line, on a busy street corner, would be soon cut up by the traffic passing over the same.

We think the language of the court of appeals of the state of New York in the case of *Taylor* v. *City of Yonkers,* 105 N. Y. 202, 59 Am. Rep. 492, 11 N. E. 642, applicable to and illustrative of the conclusions reached by us, and the reasons therefor, in which case the court said: "When the streets have been wholly or partially cleaned, it often happens that a fall of rain or the melting of adjoining snow is suddenly followed by severe cold, which covers everything with a film or layer of ice and makes the walks slippery and dangerous. This frozen surface it is practically impossible to remove until a thaw comes which remedies the evil. The municipality is not negligent for awaiting that result."

We think that in this case plaintiff merely slipped on the [9] ice and fell, resulting in unfortunate injuries to her; that she fell, not because of the ice being in itself a dangerous obstruction to her walking over the street, but because it was smooth and slippery. That plaintiff was badly injured, it does not follow that the city must pay her therefor. It is not an insurer. To authorize a recovery her injuries must have been caused by some failure on the part of the defendant in the performance of a duty owing to her. The burden of proof was on the plaintiff to show this, and her proof must be more than to cause a mere conjecture. (*City of De Pere* v. *Hibbard,* 104 Wis. 666, 80 N. W. 933; *Mueller* v. *City of Mil-*

*waukee,* 110 Wis. 623, 86 N. W. 162.) The verdict of the jury cannot be sustained.

The judgment and order appealed from are reversed and the cause is remanded to the district court of Silver Bow county for a new trial.

*Reversed and remanded.*

Associate Justices Holloway and Galen concur.

Mr. Chief Justice Callaway and Mr. Justice Cooper did not hear the argument and take no part in the foregoing decision.