MR. JUSTICE SHEEHY
delivered the Opinion of the court.
We hold in this case that Section 2-9-107, MCA, is unconstitutional, insofar as it limits the liability of the State or any political subdivision in tort actions for damages suffered from an act or omission of an officer, agent, or employee of the entity to amounts not in excess of $300,000 for each claimant and $1,000,000 for each occurrence.
Richard B. Pfost filed his complaint in the District Court, Fourth Judicial District, Missoula County, for personal injuries that he alleged were due to the negligence of the State of Montana, Department of Highways, Montana Highway Patrol, and Missoula and Mineral Counties. Mineral County was subsequently dismissed from the suit.
*209 Pfost alleged that on April 6, 1981, he was driving a 1977 Peterbilt tractor on Interstate 90 about 23 miles west of Missoula when he encountered a bridge on Nine Mile Hill. The bridge was extremely icy, dangerous and hazardous and had been left in such a condition for several hours. He alleged no precautions were taken by defendants despite the fact that three separate wrecks had occurred prior to Pfost’s arrival. Pfost lost control of his rig, crashed through the guardrail, and plummeted over the west bank of the bridge. He sustained a broken neck and is now a quadriplegic. He seeks compensatory damages of $6 million.
On the same day as his complaint for personal injuries, Pfost filed an action for declaratory judgment in the same District Court alleging that Section 2-9-107, MCA, is unconstitutional. The District Court, after holding a hearing and accepting briefs on the question of declaratory relief, granted Pfost’s motion for summary judgment and declared Section 2-9-107, MCA, unconstitutional. The State and Missoula County appealed that ruling to this court.
I.
A review of the history in Montana of state governmental immunity in tort actions is helpful for perspective in this case.
There was no provision in the 1889 Montana Constitution directly bearing on governmental immunity. In Art. VII, Section 20 of that Constitution, it was provided that “. . .no claim against the state, except for salaries and compensation of officers fixed by law, [should] be passed upon by the legislative assembly without first having been considered and acted upon by [the Board of Examiners],” which then consisted of the Governor, the Secretary of State, and the Attorney General. 1889 Mont. Const., Art. VII, Section 20. It was held that Art. VII, Section 20 of the 1889 Constitution applied to unliquidated claims. State ex rel. Schneider v. Cunningham (1909), 39 Mont. 165, 172, 101 P. 962, 963.
In 1907, the legislature provided a method for presenting unsettled claims against the state. Any person having a claim, the settlement of which was not otherwise provided for by law, was Pfost, required to present the same to the Board of Examiners, at least two months before the legislative assembly, accompanied by a verified statement showing the facts constituting the claim. The Board of Examiners was to examine such claims and make a report to the legislature as to the facts found and its recommendations. It was then up to the *210 legislature, if it accepted a claim, to make an appropriation for its payment. Once the claim was rejected either by the Board or by the legislature, a demand could not be made against the State again. There was, however, an appeal from an adverse decision of the Board to the legislative assembly itself. See Sections 242 to 248 inclusive, R.C.M. 1935.
The view of this court respecting state immunity was expressed in Mills v. Stewart (1926), 76 Mont. 429, 436, 247 P. 332, 333. That case involved the tort claim of George Rietz, a student at the State University at Missoula, who had stepped through a door leading to an elevator shaft instead of to a bathroom as he surmised. He received injuries which were the basis of his claim against the State.
This Court said:
“If the contention advanced by Rietz is well founded in fact, his injuries resulted proximately from the negligence of the person responsible for the care and management of the dormitory building, and against such person he has a valid, legal claim which he might enforce in an appropriate action at law. The dormitory building is the property of the state, and the state is charged with its management and control, and, while it does not have any moral right to commit a tortious act, it has the same capacity to do so as any other corporation. (Citing authority) The maxim of the English law, ‘the King can do no wrong,’ does not find a place in the jurisprudence in this country. (Citing authority) The state, like any other corporation, can act only through its agents, and if the state of Montana were a private corporation, it would be responsible to Rietz in an action at law for the damages resulting proximately from the negligence of its agent in charge of the dormitory building. But the state is a public corporation, and out of considerations of public policy the doctrine of respondeat superior does not apply to it unless assumed voluntarily. In other words, the state is not liable for the negligent acts of its agents unless through the legislative department of government it assumes such liability.” 76 Mont. at 435-36, 247 P. at 333.
In Mills, this Court held that the appropriation of money to pay the Rietz’s claim was an appropriation for a public and not a private purpose and therefore met the requirements of the 1889 Montana Constitution.
Under this system of acting on tort claims against the State submitted by the Board of Examiners, the legislature found itself in the unpalatable position of acting as judge, jury, and responsible party *211 in determining and settling such tort claims. See for example, claim of Chamberlain, House Bill No. 55, at 1110, Laws of Montana (1959); claim of Jenkins, House Bill No. 458, at 901, Laws of Montana (1965).
The sovereign immunity of the State was construed by this Court to prevent suits against officers or agents of the State individually when acting in their official capacity. In a claim and delivery action against the Fish and Game commissioners, a game warden and a deputy game warden, in their official capacities, to recover a confiscated shotgun, the suit was an ex delicto action against the State and could not be maintained where the State had not consented to be sued. Heiser v. Severy (1945), 117 Mont. 105, 158 P.2d 501.
The blanket immunity that was extended to the State, its officers, agents and employees by court decisions was not complete for counties, cities, or other entities which had authority less extensive than the State. For school districts and counties, it made a difference whether the activity of the district or county which gave rise to the tort action was considered governmental or proprietary. Cities did not enjoy immunity from suits, even if the tort arose from what would be considered governmental operations. Thus, a city could be sued for injuries resulting from its failure to exercise an active vigilance to keep all of its streets in a safe condition suitable for public use, and to avoid the accumulation of snow and ice. O’Donnell v. City of Butte (1922), 65 Mont. 463, 211 P. 190. A city’s liability for keeping the streets reasonably safe could not be delegated to the abutting landowner. Headley v. Hammon Building, Inc., et al. (1934), 97 Mont. 243, 33 P.2d 574. This Court explained the historical reasons for extending immunity to counties from tort actions but not to cities in Johnson v. City of Billings, et al. (1936), 101 Mont. 462, 54 P.2d 579. Nonetheless, while the city acted in its proprietary capacity in maintaining a fire department, when firemen were actually engaged in the performance of their duties as such, they were acting in a governmental capacity and in such cases the city was not liable for their torts. State ex rel. Kern v. Arnold (1935), 100 Mont. 346, 49 P.2d 976.
The county was held liable to suit for tort on the ground that maintaining a ferry across the Missouri River was a proprietary function. Jacoby v. Chouteau County (1941), 112 Mont. 70, 112 P.2d 1068. Likewise a county, working jointly with a city in the construction of a drain ditch, was acting in a proprietary function, and liable in a tort action although the action arose from the repair of a road *212 which might ordinarily be considered a governmental function. Johnson v. City of Billings, supra.
In Longpre v. School District No. 2 (1968), 151 Mont. 345, 443 P.2d 1, it was held that governmental immunity of a school district to tort action was waived by the legislature when it required school districts to purchase bodily injury and liability insurance in the operation of school buses to transport school children.
In 1963, the legislature adopted Section 40-4402, R.C.M. 1947, which provided that when an insurer insured any political subdivision of the state, municipality, or any public body for casualty or liability insurance, neither the insured nor insurer could raise the defense of immunity from suit in a damage action brought against the insured or insurer. This statute provided that if the defendant could have successfully raised the defense of immunity, and the verdict exceeded the limits of applicable insurance, the court had the power to reduce the amount of judgment against the defendant to a sum equal to the limits stated in the policy. In Boettger v. Employers Liability Assurance Corp. (1971), 158 Mont. 258, 490 P.2d 717, this Court stated that if the amount of liability after judgment exceeded the amount of insurance, the policy should be delivered by the claimant to the District Court to apply the limitation required by Section 40-4402.
In Cassady v. City of Billings (1959), 135 Mont. 390, 340 P.2d 509, it was conceded that the operation of an ice skating rink by a city was a proprietary function, but this Court held against the plaintiff on other grounds.
Such was the state of the law when the framers met in 1972 to consider a new Montana Constitution. The state and its agents enjoyed total immunity from suit for tort action unless a policy of liability insurance existed which covered the activity giving rise to the tort. In that event the insured could not raise the defense of immunity, and the District Court after judgment could reduce the judgment to the amount of available insurance.
Counties enjoyed complete immunity for governmental functions but not for proprietary functions. Cities did not enjoy immunity. Any governmental agency whose authority was less extensive than the state could protect itself by obtaining liability insurance, and if the entity was entitled to immunity in the particular field, again the District Court could reduce any judgment to a figure within the limits of the insurance coverage.
In 1972, the constitutional framers swept aside all notions of gov *213 ernmental immunity, and provided in the original version of Art. II, Section 18, 1972 Montana Constitution the following:
“Section 18. State Subject to Suit. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property. This provision shall apply only to causes of action arising after July 1, 1973.”
If there was any doubt as to the intentions of the framers with respect to the language of Art. II, Section 18, that doubt was removed by this Court in Noll and Keneady v. Bozeman (1975), 166 Mont. 504, 534 P.2d 880. There this Court said:
“A reading of the record of the 1972 Constitutional Convention clearly indicates the framers intended to provide redress for all persons, whether victims of governmental or private torts. In referring to the concept of sovereign immunity the Bill of Rights Committee reported to the Convention:
“ ‘The committee finds this reasoning repugnant to the fundamental premise of the American justice: all parties should receive fair and just redress whether the injuring party is a private citizen or a governmental agency.’
“The chairman of that committee, speaking from the Convention floor, told the delegates:
“ ‘We submit it’s an inalienable right to have remedy when someone injures you through negligence and through wrongdoing, regardless of whether he has the status of a governmental servant or not.’ ” 166 Mont. at 507-08, 534 P.2d at 882.
On November 5, 1974, at its general election, the people of the State of Montana amended Art. II, Section 18, by adopting proposed constitutional amendment No. 2 by. a vote of 108,704 to 76,252. After the adoption of the Constitutional amendment, effective July 1, 1975, Art. II, Section 18, of the 1972 Montana Constitution now reads as follows:
“Section 18. State Subject to Suit. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a % vote of each house of the legislature.”
In 1977, the legislature adopted Section 2-9-104, MCA, which provided a limitation in government liability for damages and tort as follows:
“2-9-104. Limitation on governmental liability for damages in tort — petition for relief in excess of limits. (1) Neither the state, a *214 county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for:
“(a) noneconomic damages; or
“(b) economic damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $300,000 for each claimant and $1 million for each occurrence.
“(2) The legislature or the governing body of a county, municipality, taxing district, or other political subdivision of the state may, in its sole discretion, authorize payments for noneconomic damages or economic damages in excess of the sum authorized in Subsection (l)(b) of this Section, or both, upon petition of plaintiff following a final judgment. No insurer is liable for such noneconomic damages or excess economic damages unless specifically authorized in the contract of insurance.”
The validity of Section 2-9-104, MCA, came before us in White v. State of Montana (Mont. 1983), 661 P.2d 1272, 40 St.Rep. 507. This Court held that the limitations of state liability provided in Section 2-9-104 were unconstitutional. We shall discuss this case later in this opinion.
Within two weeks after our opinion in White v. State, supra, the legislature met and passed, and the Governor signed Section 2-9-107, MCA, the language of which we set out hereafter. It should be mentioned that a further provision of the new law provides that Section 2-9-107 is to apply retroactively “to all claims, lawsuits and causes of action arising after July 1,1977.” (Ch. 675, Section 7, Laws of Montana (1983).) Section 2-9-107 became effective on April 29, 1983.
II.
The words and figures of Section 2-9-107, MCA, the statute we today find invalid, follow:
“2-9-107. Limitation on governmental liability for damages in tort. (1) Neither the state, a county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $300,000 for each claimant and $1 million for each occurrence.
“(2) No insurer is liable for excess damages unless such insurer specifically agrees by written endorsement to provide coverage to the governmental agency involved in amounts in excess of a limita *215 tion stated in this section, in which case the insurer may not claim the benefits of the limitation specifically waived.”
On its face, the statute is discriminatory. That point should be beyond argument. It discriminates in that any person who sustains damages of less than $300,000 in value will be fully redressed if the tortfeasor is the State, but any person with catastrophic damages in excess of $300,000 will not have full redress. Of course, if the statute were not discriminatory, there would be no need for any further inquiry into its constitutionality. There is tacit concession on all sides, however, that because the statute prevents full redress for those persons whose damages exceed $300,000 in state tort actions, an equal protection inquiry is triggered. For that reason the State and County have principally based their contentions here on whether Section 2-9-107, MCA, can be found valid either on rationality or on both rationality and compelling state interest considerations.
Art. II, Section 4, of our State Constitution provides in part that “[n]o person shall be denied the equal protection of the laws.” Art. II, Section 4, 1972 Mont. Const. That provision of our State Constitution, though similar in wording to the last clause of the Fourteenth Amendment of the Federal Constitution provides a separate ground on which rights of persons within this state may be founded, and under accepted principles of constitutional law such rights must be at least the same as and may be greater than rights founded on the federal clause. Thus, states may interpret their own constitutions to afford greater protections than the Supreme Court of the United States has recognized in its interpretations of the federal counterparts to state constitutions. City and County of Denver v. Nielson (1977), 194 Colo. 407, 572 P.2d 484. Federal rights are considered minimal and a state constitution may be more demanding than the equivalent federal constitutional provision. Washakie Co. Sch. Dist. No. One v. Herschler (Wyo. 1980), 606 P.2d 310, cert. den. 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28. This is true even though our state constitutional language is substantially similar to the language of the Federal Constitution. Deras v. Myers (1975), 272 Or. 47, 535 P.2d 541, 549 n. 17.
This is not to say that we fear that a different result would be demanded in this case if we founded our constitutional interpretation of Section 2-9-107, MCA, strictly upon the equal protection clause of the Fourteenth Amendment of the Federal Constitution. What we advance here is that we have state constitutional provisions which, properly interpreted, command the result that we reach *216 today and that such result, founded on state constitutional interpretation, does not countervail the minimal federal rights guaranteed by the Fourteenth Amendment.
It is perfectly proper for us to use criteria developed in federal cases to determine whether our state statute passes equal protection muster under our State Constitution. Thus we determine first whether the challenged statute affects a fundamental interest, see for e.g. Dunn v. Blumstein (1972), 405 U.S. 330, 336-42, 92 S.Ct. 995, 999-1003, 31 L.Ed.2d 274, 280-84; Shapiro v. Thompson (1969), 394 U.S. 618, 629-31, 89 S.Ct. 1322, 1328-30, 22 L.Ed.2d 600, 612-13; or contains a classification based upon a suspect criterion, see, e.g., Graham v. Richardson (1971), 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534; McLaughlin v. Florida (1964), 379 U.S. 184, 191-92, 85 S.Ct. 283, 288-89, 13 L.Ed.2d 222, 228-29. If so, the state must show a compelling state interest to sustain such a statute. If instead the statute involves only a regulation of economic or commercial matters, e.g. Western and Southern Life Insurance Company v. State Board of Equalization (1981), 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514; Minnesota v. Clover Leaf Creamery Company (1981), 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659, the lenient standard of rationality is applied. Such federal criteria are routinely used to determine equal protection questions under state constitutions. For example, in Washakie Co. Sch. Dist. No. One v. Herschler, 606 P.2d at 333, it is stated:
“The reasoning which we approve of and which we have applied to the instant case involves two different tests which are designed to determine if statutory classifications meet equal protection requirements. The first test is employed where the interest affected is an ordinary one and the second where fundamental interests are at issue. When an ordinary interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification made by the statute or statutes being viewed, and a legitimate state objective. When a fundamental interest is affected or if a classification is inherently suspect, then the classification must be subjected to strict scrutiny to determine if it is necessary to achieve a compelling state interest. In addition, this test requires that the state establish that there is no less onerous alternative by which its objective may be achieved.”
*217 III.
Missoula County concedes in its brief that “. . . it is established that, in Montana, the right to bring a civil action for personal injuries is a fundamental right.” White v. State of Montana (1983), [203 Mont. 363,] 661 P.2d 1272, 40 St.Rep. 507.
The State of Montana likewise concedes:
“. . . that statutory denial of any right to be compensated for any component of injury, including physical pain, mental anguish, loss of enjoyment of living, would be an effect on a ‘fundamental right’ which would be required to be measured by a ‘strict scrutiny’ test in order to pass constitutional muster, and that the Karla White case so held. It may also be conceded here that in such a case, in order for the strict scrutiny test to result in a conclusion of constitutionality, there must be a demonstration that the law is necessary to promote a compelling governmental interest, and the Karla White case ruled that also.”
In White we had before us the constitutionality of Section 2-9-104, MCA. That statute provided that neither the state nor any political subdivision of the state was liable in tort action for noneconomic damages, nor for economic damages in excess of $300,000 for each claimant and $1 million for each occurrence. This Court struck down Section 2-9-104, MCA, as unconstitutional, holding that the right to bring an action for personal injuries was a fundamental right and that any statutory abridgment of that fundamental right must pass the test of strict scrutiny. We relied on Art. II, Section 16 of the 1972 Montana Constitution, and upon our decision in Corrigan v. Janney (Mont. 1981), 626 P.2d 838, 38 St.Rep. 545, to hold that the right to sue for personal injuries embraced “all recognized compensable components of injury, including the right to be compensated for physical pain and mental anguish and the loss of enjoyment of living.” White v. State, 661 P.2d at 1275, 40 St.Rep. at 510. We further found that the interest of the state in “insuring that sufficient public funds will be available to enable the State and local governments to provide those services which they believe benefit their citizens and which their citizens demand” was a “bare assertion” which failed to justify a discrimination which infringed upon fundamental rights. Id.
The pricking point upon which the State and County seek to distinguish White from the case at bar is that while the right to sue for personal injuries is a fundamental right, the right to recover dam *218 ages is not; or as encapsulated by the State, the “lower court sustains the proposition that a monetary limitation as to amount of damage recovery is the denial of some fundamental right. This is, precisely, the point at which error is brought into being.”
The State contends that there is no fundamental constitutional right to recover all amounts of damages and that we cannot create substantive constitutional rights in the name of guaranteeing equal protection of the laws. It relies for authority on the case of San Antonio Independent School District v. Rodriguez (1973), 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. What the State failed to note, however, the San Antonio School District case was one in which the United States Supreme Court examined the Federal Constitution in the light of the Fourteenth Amendment. In San Antonio School District, the United States Supreme Court held that the right to education was not explicitly guaranteed by the Constitution of the United States. In a later California case, Serrano v. Priest (1976), 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, (rehearing denied as modified 1977), cert. den. 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079, the California Court abandoned Fourteenth Amendment and other federal concepts because of the decision in San Antonio School District, and found that under the California Constitution there was a fundamental right to education which could not be discriminatorily affected on the basis of available wealth in taxing districts.
Pertinent to this case are state constitutional provisions in addition to the equal protection clause found in Art. II, Section 4. The legislature, in enacting Section 2-9-107, MCA, purported to act under Art. II, Section 18 which states:
“The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for an injury to a person or property, except as may be specifically provided by a ⅔ vote of each house of the legislature.”
However, Art. II, Section 16 of the State Constitution gives a constitutional right of full legal redress for injury. That section of the state constitution provides:
“Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such *219 an immediate employer provides coverage under Workman’s Compensation Laws of this state ...”
The use of the clause “this full legal redress” has major significance. It obviously and grammatically refers to the “speedy remedy afforded for every injury of person, property, or character.” The adjective “this” means the person, thing, or idea that is present or near in place, time or thought or that has just been mentioned. Webster’s New Collegiate Dictionary (1981). The constitutional framers thus construed a “speedy remedy” as comprehending “full legal redress.” A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property or character therefore affects a fundamental right and the state must show a compelling state interest if it is to sustain the constitutional validity of the statute.
In enacting Section 2-9-107 the legislature made findings which the state contends establish a compelling state interest. It contends that constitutionality must be presumed, that all facts necessary to sustain the statute must be taken as conclusively found by the legislature, that the correctness of the findings is conclusive unless an abuse of discretion can be shown and that courts do not have jurisdiction or power to reopen, correct or make new findings of fact.
We have shown above that the state constitution provides a speedy judicial remedy for every injury of person, property or character, and that such speedy remedy includes a full legal redress as a fundamental interest. Since a fundamental interest is involved, Section 2-9-107, MCA, must be subjected to strict judicial scrutiny in determining whether it complies with our state equal protection provisions and other provisions of our State Constitution. Under this standard the presumption of constitutionality normally attaching to the state legislative classifications falls away and the State must shoulder the burden of establishing that the classification in question is necessary to achieve a compelling state interest. Serrano, supra, 557 P.2d at 952; Washakie Co. Sch. Dist. No. One v. Herschler, supra.
We set out here in full the legislative findings codified in Section 2-9-106, MCA. On these the State relies to sustain the validity of Section 2-9-107:
“2-9-106. Legislative findings. (1) The legislature recognizes and reaffirms the report of the subcommittee on judiciary, contained in the interim study on limitations on the waiver of sovereign immunity (December 1976), that unlimited liability of the state and local *220 governments for civil damages makes it increasingly difficult if not impossible for governments to purchase adequate insurance coverage at reasonable costs.
“(2) The legislature finds that the obligations imposed upon governmental entities must be performed, even though the risks inherent in performing absolute obligations are great. The responsibility for confining, housing, and rehabilitation of persons convicted of criminal activity; the treatment and supervision of mental patients at government institutions or under government programs; the planning, construction, and maintenance of thousands of miles of highways; the operation of municipal transportation systems and airport terminals; and the operation and maintenance of schools, playgrounds, and athletic facilities are only a few of those obligations.
“(3) The legislature finds that there are many functions and services both governmental and proprietary in nature traditionally offered by the state and other governmental entities which, because of the size of government operations and the inherent nature of certain functions and services, entail a potential for civil liability for tortious conduct far beyond the potential for liability of corporations and other persons in the private sector. Despite this potential for liability unparalleled in the private sector, the legislature finds that these functions of government are necessary components of modern life and that, despite limited resources and competition for those resources between necessary programs and entities, all functions and services both governmental and proprietary in nature are deserving of conscious and deliberate continuation or retirement by the people through their elected representatives. The legislature further finds that liability for damages resulting from tortious conduct by a government or its employees is more than a cost of doing business and has an effect upon government far beyond a simple reduction in governmental revenues. Unlimited liability would, because of the requirement for a balanced state budget contained in Article VIII, Section 9, of the Montana constitution and because bankruptcy is a remedy unavailable to the state and most other governmental entities, result initially in increased taxes to pay judgments for damages and would eventually have the effect of reallocating state resources to a degree that would result in involuntary choices between critical state and local programs. The legislature finds these potential results of unlimited liability for tort damages to be unacceptable and further finds that, given the realities of modern government and the litigiousness of our society, there is no practical way of completely *221 preventing tortious injury by and tort damages against the state and other governmental entities. The legislature therefore expressly finds that forced reduction in critical governmental services that could result from unlimited liability of the state and other governmental entities for damages resulting from tortious conduct of those governments and their employees constitutes a compelling state interest requiring the application of the limitations on liability and damages provided in parts 1 through 3 of this chapter.”
Bearing in mind that in White v. State, supra, we upheld the provisions of Section 2-9-105, MCA, to the effect that state and political entities are immune from awards of punitive damages, we find little more in the quoted legislative findings supporting Section 2-9-107 than a legislative plea not to require the legislature and other political entities to provide the funds necessary to pay the just obligations of those entities. In White, we also stated that the payment of tort judgments by political entities was simply a cost of doing business. 661 P.2d at 1275, 40 St.Rep. 510. The legislature in its findings contends that paying a judgment is more than the cost of doing business, and would, because of the constitutional requirements of a balanced state budget “result initially in increased taxes to pay judgments for damages and would eventually have the effect of reallocating state resources to a degree that would result in involuntary choices between critical state and local programs.” Section 2-9-106, MCA. That statement is so wild in speculation as to be on its face unacceptable. Having to provide funds to pay judgments is not a sufficient excuse logically or legally. The legislature would place the burden of catastrophic damages not on the State whose agent caused them, but on the unfortunate person who received them. If the state constitutional framers in 1972 were concerned with any particular subject, they were certainly concerned with the importance of the individual. They detailed important individual rights in 35 sections of Art. II of the State Constitution, being careful to provide in Section 34 that the specific enumeration of rights did not “deny, impair, or disparage other rights retained by the people.” The findings of the legislature denigrate the right of the individual to full legal redress in favor of not raising taxes. Such a concept does not constitute either an acceptable or a compelling state interest.
As we analyze Section 2-9-107, MCA, we find little difference between it and the statute we found invalid in White, that prohibited recovery against governmental entities for noneconomic damages. Section 2-9-107, permits some recovery from noneconomic damages, *222 but limits the amount that can be recovered. In legal effect, Section 2-9-107, is but Section 2-9-104 in another guise. In each case the injured party suffers a restriction of his right to full legal redress. Our decision in White therefore controls the outcome of this case — the legislature has invaded a fundamental right granted to individuals, and it has not shown a compelling state interest for doing so.
In addition to the necessity that the State show a compelling state interest for an invasion of a fundamental right, the state, to sustain the validity of such invasion, must also show that the choice of legislative action is the least onerous path that can be taken to achieve the state objective. Washakie County, supra. Here the state has not attempted to make any such showing.
We see no substance in the State’s contention, echoed in the legislative findings, that limitations on damages against governmental entities are necessary because the functions and services of such entities “entail a potential for civil liability for tortious conduct far beyond the potential for liability of corporations and other persons in the private sector.” Section 2-9-106, MCA. There is no foundation in fact for such a statement. The federal government carries on governmental functions and services immensely greater in complexity and more far flung, yet it provides redress for victims of federal government torts under the Federal Tort Claims Act. See 28 U.S.C. Section 2674. Several large corporations in this state carry on their business functions and activities, and respond in full in damages, both compensatory and punitive, as part of their cost of business. It is a novel argument indeed for a party to complain that it is too big and complex, or its employees too poorly trained and unchecked, for the party to be able to respond in damages for its tortious acts.
Both the State and the County in this case centered their arguments on the proposition that there was no fundamental interest involved in this case and therefore the State had only to meet the test of a rational nexus between the legislation and the state objective in enacting the legislation. Under the record in this case, we doubt that the legislation could pass even the lenient rational basis test but we do not reach that argument here. Since a fundamental interest is involved, we have examined the case from the viewpoint that the legislation requires strict judicial scrutiny to be sustained under our State Constitution.
Further argument advanced by both the State and the county is that since the amendment to the immunity clause in the State Constitution, adopted by a referendum vote of the people, empowers the *223 legislature to fix immunity limits by a two thirds vote of each house of the legislature, that power is in effect part of the constitution itself and not subject to challenge.
We reject out of hand that the legislature has the power, under Art. II, Section 18, as amended, to act under that amended clause without regard to other provisions of the State Constitution. We agree with the rationale of the California Supreme Court in Serrano, supra, where it said:
“It seems to be argued, however, that because article XXIII, Section 21 authorizes the financing of schools by a county levy of school district taxes, the Legislature is free to structure a system based upon this mechanism in any way that it chooses. Such a notion, we hasten to point out is manifestly absurd. A constitutional provision creating the duty and power to legislate in a particular area always remains subject to general constitutional requirements governing all legislation unless the intent of the Constitution to exempt it from such requirements plainly appears.” 557 P.2d at 956.
We do not reach, because it is not necessary here, whether the grant to the legislature under the amended version of Art. II, Section 18, is an impermissible grant to the legislature to amend the constitution.
The grounds upon which we hold today that Section 2-9-107 is unconstitutional are somewhat different from those grounds utilized by the District Court in this case. The result, however, must be the same under our examination of the statute. We therefore hold that Section 2-9-107, MCA, is an unconstitutional invasion by the legislature on a fundamental right granted under the State Constitution to sue governmental entities for full legal redress.
In view of our decision, it is not necessary to discuss other issues raised by the parties. The judgment of the District Court is affirmed.
MR. JUSTICES MORRISON, HARRISON and HUNT concur.