No. 85-07

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

RICHARD B. PFOST,

       Plaintiff and Respondent,

  -vs-

THE STATE OF MONTANA, MISSOULA COUNTY,
and MINERAL COUNTY, political subdivisions
of the State of Montana,

       Defendants and Appellants.

---

APPEAL FROM:  District Court of the Fourth Judicial District
              In and for the County of Missoula,
              The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        J. Michael Young argued, Dept. of Administration,
        Helena, Montana
        Clayton Herron, Dept. of Administration, Helena
        Boone, Karlberg & Haddon; Randy J. Cox argued for
        Missoula County, Missoula, Montana
        M. Shaun Donovan, Mineral County Attorney, Superior,
        Montana

    For Respondent:

        Green, MacDonald & Kirscher; Joan B. Newman argued for
        Pfost, Missoula, Montana

    For Amicus Curiae:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Goetz, Madden & Dunn; James Goetz argued for Leslie
        Erickson, Bozeman, Montana
        Michael W. Flanigan, for Erickson, Anchorage, Alaska
        Crowley Law Firm; Randall Bishop for Oscar L.
        Heinrich, Jr., Billings, Montana

---

              Submitted:  August 29, 1985

                Decided:  December 31, 1985

Filed: **DEC 31 1985**

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

We hold in this case that § 2-9-107, MCA, is unconstitutional, insofar as it limits the liability of the State or any political subdivision in tort actions for damages suffered from an act or omission of an officer, agent, or employee of the entity to amounts not in excess of $300,000 for each claimant and $1,000,000 for each occurrence.

Richard B. Pfost filed his complaint in the District Court, Fourth Judicial District, Missoula County, for personal injuries that he alleged were due to the negligence of the State of Montana, Department of Highways, Montana Highway Patrol, and Missoula and Mineral Counties. Mineral County was subsequently dismissed from the suit.

Pfost alleged that on April 6, 1981, he was driving a 1977 Peterbilt tractor on Interstate 90 about 23 miles west of Missoula when he encountered a bridge on Nine Mile Hill. The bridge was extremely icy, dangerous and hazardous and had been left in such a condition for several hours. He alleged no precautions were taken by defendants despite the fact that three separate wrecks had occurred prior to Pfost's arrival. Pfost lost control of his rig, crashed through the guardrail, and plummeted over the west bank of the bridge. He sustained a broken neck and is now a quadriplegic. He seeks compensatory damages of $6 million.

On the same day as his complaint for personal injuries, Pfost filed an action for declaratory judgment in the same District Court alleging that § 2-9-107, MCA, is unconstitutional. The District Court, after holding a

hearing and accepting briefs on the question of declaratory relief, granted Pfost's motion for summary judgment and declared § 2-9-107, MCA, unconstitutional. The State and Missoula County appealed that ruling to this Court.

I.

A review of the history in Montana of state governmental immunity in tort actions is helpful for perspective in this case.

There was no provision in the 1889 Montana Constitution directly bearing on governmental immunity. In Art. VII, § 20 of that Constitution, it was provided that ". . . no claim against the state, except for salaries and compensation of officers fixed by law, [should] be passed upon by the legislative assembly without first having been considered and acted upon by [the Board of Examiners]," which then consisted of the Governor, the Secretary of State, and the Attorney General. 1889 Mont. Const., Art. VII, § 20. It was held that Art. VII, § 20 of the 1889 Constitution applied to unliquidated claims. State ex rel. Schneider v. Cunningham (1909), 39 Mont. 165, 172, 101 P. 962, 963.

In 1907, the legislature provided a method for presenting unsettled claims against the state. Any person having a claim, the settlement of which was not otherwise provided for by law, was required to present the same to the Board of Examiners, at least two months before the legislative assembly, accompanied by a verified statement showing the facts constituting the claim. The Board of Examiners was to examine such claims and make a report to the legislature as to the facts found and its recommendations. It was then up to the legislature, if it accepted a claim, to make an appropriation for its payment. Once the claim was

rejected either by the Board or by the legislature, a demand could not be made against the State again. There was, however, an appeal from an adverse decision of the Board to the legislative assembly itself. See sections 242 to 248 inclusive, R.C.M. 1935.

The view of this Court respecting state immunity was expressed in Mills v. Stewart (1926), 76 Mont. 429, 436, 247 P. 332, 333. That case involved the tort claim of George Rietz, a student at the State University at Missoula, who had stepped through a door leading to an elevator shaft instead of to a bathroom as he surmised. He received injuries which were the basis of his claim against the State.

This Court said:

"If the contention advanced by Rietz is well founded in fact, his injuries resulted proximately from the negligence of the person responsible for the care and management of the dormitory building, and against such person he has a valid, legal claim which he might enforce in an appropriate action at law. The dormitory building is the property of the state, and the state is charged with its management and control, and, while it does not have any moral right to commit a tortious act, it has the same capacity to do so as any other corporation. (Citing authority.) The maxim of the English law, 'the King can do no wrong,' does not find a place in the jurisprudence in this country. (Citing authority.) The state, like any other corporation, can act only through its agents, and if the state of Montana were a private corporation, it would be responsible to Rietz in an action at law for the damages resulting proximately from the negligence of its agent in charge of the dormitory building. But the state is a public corporation, and out of considerations of public policy the doctrine of respondeat superior does not apply to it unless assumed voluntarily. In other words, the state is not liable for the negligent acts of its agents unless through the legislative department of government it assumes such liability." 76 Mont. at 435-36, 247 P. at 333.

In Mills, this Court held that the appropriation of money to pay the Rietz's claim was an appropriation for a

public and not a private purpose and therefore met the requirements of the 1889 Montana Constitution.

Under this system of acting on tort claims against the State submitted by the Board of Examiners, the legislature found itself in the unpalatable position of acting as judge, jury, and responsible party in determining and settling such tort claims. See for example, claim of Chamberlain, House Bill no. 55, at 1110, Laws of Montana (1959); claim of Jenkins, House Bill no. 458, at 901, Laws of Montana (1965).

The sovereign immunity of the State was construed by this Court to prevent suits against officers or agents of the State individually when acting in their official capacity. In a claim and delivery action against the Fish and Game commissioners, a game warden and a deputy game warden, in their official capacities, to recover a confiscated shotgun, the suit was an ex delicto action against the State and could not be maintained where the State had not consented to be sued. Heiser v. Severy (1945), 117 Mont. 105, 158 P.2d 501.

The blanket immunity that was extended to the State, its officers, agents and employees by court decisions was not complete for counties, cities, or other entities which had authority less extensive than the State. For school districts and counties, it made a difference whether the activity of the district or county which gave rise to the tort action was considered governmental or proprietary. Cities did not enjoy immunity from suits, even if the tort arose from what would be considered governmental operations. Thus, a city could be sued for injuries resulting from its failure to exercise an active vigilance to keep all of its streets in a safe condition suitable for public use, and to avoid the accumulation of snow and ice. O'Donnell v. City of

Butte (1922), 65 Mont. 463, 211 P. 190. A city's liability for keeping the streets reasonably safe could not be delegated to the abutting landowner. Headley v. Hammon Building, Inc., et al. (1934), 97 Mont. 243, 33 P.2d 574. This Court explained the historical reasons for extending immunity to counties from tort actions but not to cities in Johnson v. City of Billings. et al. (1936), 101 Mont. 462, 54 P.2d 579. Nonetheless, while the city acted in its proprietary capacity in maintaining a fire department, when fireman were actually engaged in the performance of their duties as such, they were acting in a governmental capacity and in such cases the city was not liable for their torts. State ex rel. Kern v. Arnold (1935), 100 Mont. 346, 49 P.2d 976.

The county was held liable to suit for tort on the ground that maintaining a ferry across the Missouri River was a proprietary function. Jacoby v. Chouteau County (1941), 112 Mont. 70, 112 P.2d 1068. Likewise a county, working jointly with a city in the construction of a drain ditch, was acting in a proprietary function, and liable in a tort action although the action arose from the repair of a road which might ordinarily be considered a governmental function. Johnson v. City of Billings, supra.

In Longpre v. School District No. 2 (1968), 151 Mont. 345, 443 P.2d 1, it was held that governmental immunity of a school district to tort action was waived by the legislature when it required school districts to purchase bodily injury and liability insurance in the operation of school buses to transport school children.

In 1963, the legislature adopted section 40-4402, R.C.M. 1947, which provided that when an insurer insured any

political subdivision of the state, municipality, or any public body for casualty or liability insurance, neither the insured nor insurer could raise the defense of immunity from suit in a damage action brought against the insured or insurer. This statute provided that if the defendant could have successfully raised the defense of immunity, and the verdict exceeded the limits of applicable insurance, the court had the power to reduce the amount of judgment against the defendant to a sum equal to the limits stated in the policy. In Boettger v. Employers Liability Assurance Corp. (1971), 158 Mont. 258, 490 P.2d 717, this Court stated that if the amount of liability after judgment exceeded the amount of insurance, the policy should be delivered by the claimant to the District Court to apply the limitation required by § 40-4402.

In Cassady v. City of Billings (1959), 135 Mont. 390, 340 P.2d 509, it was conceded that the operation of an ice skating rink by a city was a proprietary function, but this Court held against the plaintiff on other grounds.

Such was the state of the law when the framers met in 1972 to consider a new Montana Constitution. The state and its agents enjoyed total immunity from suit for tort action unless a policy of liability insurance existed which covered the activity giving rise to the tort. In that event the insured could not raise the defense of immunity, and the District Court after judgment could reduce the judgment to the amount of available insurance.

Counties enjoyed complete immunity for governmental functions but not for proprietary functions. Cities did not enjoy immunity. Any governmental agency whose authority was less extensive than the state could protect itself by

obtaining liability insurance, and if the entity was entitled to immunity in the particular field, again the District Court could reduce any judgment to a figure within the limits of the insurance coverage.

In 1972, the constitutional framers swept aside all notions of governmental immunity, and provided in the original version of Art. II, § 18, 1972 Montana Constitution the following:

> "Section 18. State Subject to Suit. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property. This provision shall apply only to causes of action arising after July 1, 1973."

If there was any doubt as to the intentions of the framers with respect to the language of Art. II, § 18, that doubt was removed by this Court in Noll and Keneady v. Bozeman (1975), 166 Mont. 504, 534 P.2d 880. There this Court said:

> "A reading of the record of the 1972 Constitutional Convention clearly indicates the framers intended to provide redress for all persons, whether victims of governmental or private torts. In referring to the concept of sovereign immunity the Bill of Rights Committee reported to the Convention:
>
> 'The committee finds this reasoning repugnant to the fundamental premise of the American justice: all parties should receive fair and just redress whether the injuring party is a private citizen or a governmental agency.'
>
> "The chairman of that committee, speaking from the Convention floor, told the delegates:
>
> 'We submit it's an inalienable right to have remedy when someone injures you through negligence and through wrongdoing, regardless of whether he has the status of a governmental servant or not.'" 166 Mont. at 507-08, 534 P.2d at 882.

On November 5, 1974, at its general election, the people of the State of Montana amended Art. II, § 18, by adopting proposed constitutional amendment No. 2 by a vote of 108,704

to 76,252. After the adoption of the Constitutional amendment, effective July 1, 1975, Art. II, § 18, of the 1972 Montana Constitution now reads as follows:

"Section 18. State Subject to Suit. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature."

In 1977, the legislature adopted § 2-9-104, MCA, which provided a limitation in government liability for damages and tort as follows:

"2-9-104. Limitation on governmental liability for damages in tort--petition for relief in excess of limits. (1) Neither the state, a county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for:

"(a) noneconomic damages; or

"(b) economic damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $300,000 for each claimant and $1 million for each occurrence.

"(2) The legislature or the governing body of a county, municipality, taxing district, or other political subdivision of the state may, in its sole discretion, authorize payments for noneconomic damages or economic damages in excess of the sum authorized in subsection (1)(b) of this section, or both, upon petition of plaintiff following a final judgment. No insurer is liable for such noneconomic damages or excess economic damages unless specifically authorized in the contract of insurance."

The validity of § 2-9-104, MCA, came before us in White v. State of Montana (Mont. 1983), 661 P.2d 1272, 40 St.Rep. 507. This Court held that the limitations of state liability provided in § 2-9-104 were unconstitutional. We shall discuss this case later in this opinion.

Within two weeks after our opinion in White v. State, supra, the legislature met and passed, and the Governor signed § 2-9-107, MCA, the language of which we set out

hereafter. It should be mentioned that a further provision of a the new law provides that § 2-9-107 is to apply retroactively "to all claims, lawsuits and causes of action arising after July 1, 1977." (Ch. 675, § 7, Laws of Montana (1983).) Section 2-9-107 became effective on April 29, 1983.

## II.

The words and figures of § 2-9-107, MCA, the statute we today find invalid, follow:

> "2-9-107. Limitation on governmental liability for damages in tort. (1) Neither the state, a county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $300,000 for each claimant and $1 million for each occurrence.
>
> "(2) No insurer is liable for excess damages unless such insurer specifically agrees by written endorsement to provide coverage to the governmental agency involved in amounts in excess of a limitation stated in this section, in which case the insurer may not claim the benefits of the limitation specifically waived."

On its face, the statute is discriminatory. That point should be beyond argument. It discriminates in that any person who sustains damages of less than $300,000 in value will be fully redressed if the tortfeasor is the State, but any person with catastrophic damages in excess of $300,000 will not have full redress. Of course, if the statute were not discriminatory, there would be no need for any further inquiry into its constitutionality. There is tacit concession on all sides, however, that because the statute prevents full redress for those persons whose damages exceed $300,000 in state tort actions, an equal protection inquiry is triggered. For that reason the State and County have principally based their contentions here on whether § 2-9-107, MCA, can be found valid either on rationality or on

both rationality and compelling state interest considerations.

Art. II, § 4, of our State Constitution provides in part that "[n]o person shall be denied the equal protection of the laws." Art. II, § 4, 1972 Mont. Const. That provision of our State Constitution, though similar in wording to the last clause of the Fourteenth Amendment of the Federal Constitution provides a separate ground on which rights of persons within this state may be founded, and under accepted principles of constitutional law such rights must be at least the same as and may be greater than rights founded on the federal clause. Thus, states may interpret their own constitutions to afford greater protections than the Supreme Court of the United States has recognized in its interpretations of the federal counterparts to state constitutions. City and County of Denver v. Nielson (1977), 194 Colo. 407, 572 P.2d 484. Federal rights are considered minimal and a state constitution may be more demanding than the equivalent federal constitutional provision. Washakie Co. Sch. Dist. No. One v. Herschler (Wyo. 1980), 606 P.2d 310, cert.den. 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28. This is true even though our state constitutional language is substantially similar to the language of the Federal Constitution. Deras v. Myers (1975), 272 Or. 47, 535 P.2d 541, 549 n.17.

This is not to say that we fear that a different result would be demanded in this case if we founded our constitutional interpretation of § 2-9-107, MCA, strictly upon the equal protection clause of the Fourteenth Amendment of the Federal Constitution. What we advance here is that we have state constitutional provisions which, properly

- 11 -

interpreted, command the result that we reach today and that such result, founded on state constitutional interpretation, does not countervail the minimal federal rights guaranteed by the Fourteenth Amendment.

It is perfectly proper for us to use criteria developed in federal cases to determine whether our state statute passes equal protection muster under our State Constitution. Thus we determine first whether the challenged statute affects a fundamental interest, see for e.g. Dunn v. Blumstein (1972), 405 U.S. 330, 336-42, 92 S.Ct. 995, 999-1003, 31 L.Ed.2d 274, 280-84; Shapiro v. Thompson (1969), 394 U.S. 618, 629-31, 89 S.Ct. 1322, 1328-30, 22 L.Ed.2d 600, 612-13; or contains a classification based upon a suspect criterion, see, e.g., Graham v. Richardson (1971), 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534; McLaughlin v. Florida (1964), 379 U.S. 184, 191-92, 85 S.Ct. 283, 288-89, 13 L.Ed.2d 222, 228-29. If so, the state must show a compelling state interest to sustain such a statute. If instead the statute involves only a regulation of economic or commercial matters, e.g. Western and Southern Life Insurance Company v. State Board of Equalization (1981), 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514; Minnesota v. Clover Leaf Creamery Company (1981), 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659, the lenient standard of rationality is applied. Such federal criteria are routinely used to determine equal protection questions under state constitutions. For example, in Washakie Co. Sch. Dist. No. One v. Herschler, 606 P.2d at 333, it is stated:

> "The reasoning which we approve of and which we
> have applied to the instant case involves two
> different tests which are designed to determine if
> statutory classifications meet equal protection
> requirements. The first test is employed where the

interest affected is an ordinary one and the second where fundamental interests are at issue. When an ordinary interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification made by the statute or statutes being viewed, and a legitimate state objective. When a fundamental interest is affected or if a classification is inherently suspect, then the classification must be subjected to strict scrutiny to determine if it is necessary to achieve a compelling state interest. In addition, this test requires that the state establish that there is no less onerous alternative by which its objective may be achieved."

### III.

Missoula County concedes in its brief that ". . . it is established that, in Montana, the right to bring a civil action for personal injuries is a fundamental right." White v. State of Montana (1983), 661 P.2d 1272, 40 St.Rep. 507.

The State of Montana likewise concedes:

". . . that statutory denial of any right to be compensated for any component of injury, including physical pain, mental anguish, loss of enjoyment of living, would be an effect on a 'fundamental right' which would be required to be measured by a 'strict scrutiny' test in order to pass constitutional muster, and that the Karla White case so held. It may also be conceded here that in such a case, in order for the strict scrutiny test to result in a conclusion of constitutionality, there must be a demonstration that the law is necessary to promote a compelling governmental interest, and the Karla White case ruled that also."

In White we had before us the constitutionality of § 2-9-104, MCA. That statute provided that neither the state nor any political subdivision of the state was liable in tort action for noneconomic damages, nor for economic damages in excess of $300,000 for each claimant and $1 million for each occurrence. This Court struck down § 2-9-104, MCA, as unconstitutional, holding that the right to bring an action for personal injuries was a fundamental right and that any statutory abridgment of that fundamental right must pass the test of strict scrutiny. We relied on Art. II, § 16 of the

1972 Montana Constitution, and upon our decision in Corrigan v. Janney (Mont. 1981), 626 P.2d 838, 38 St.Rep. 545, to hold that the right to sue for personal injuries embraced "all recognized compensable components of injury, including the right to be compensated for physical pain and mental anguish and the loss of enjoyment of living." White v. State, 661 P.2d at 1275, 40 St.Rep. at 510. We further found that the interest of the state in "insuring that sufficient public funds will be available to enable the State and local governments to provide those services which they believe benefit their citizens and which their citizens demand" was a "bare assertion" which failed to justify a discrimination which infringed upon fundamental rights. Id.

The pricking point upon which the State and County seek to distinguish White from the case at bar is that while the right to sue for personal injuries is a fundamental right, the right to recover damages is not; or as encapsulated by the State, the "lower court sustains the proposition that a monetary limitation as to amount of damage recovery is the denial of some fundamental right. This is, precisely, the point at which error is brought into being."

The State contends that there is no fundamental constitutional right to recover all amounts of damages and that we cannot create substantive constitutional rights in the name of guaranteeing equal protection of the laws. It relies for authority on the case of San Antonio Independent School District v. Rodriguez (1973), 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. What the State failed to note, however, the San Antonio School District case was one in which the United States Supreme Court examined the Federal Constitution in the light of the Fourteenth Amendment. In San Antonio

- 14 -

<u>School District</u>, the United States Supreme Court held that the right to education was not explicitly guaranteed by the Constitution of the United States. In a later California case, Serrano v. Priest (1976), 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, (rehearing denied as modified 1977), cert.den. 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079, the California Court abandoned Fourteenth Amendment and other federal concepts because of the decision in <u>San Antonio School District</u>, and found that under the California Constitution there was a fundamental right to education which could not be discriminatorily affected on the basis of available wealth in taxing districts.

Pertinent to this case are state constitutional provisions in addition to the equal protection clause found in Art. II, § 4. The legislature, in enacting § 2-9-107, MCA, purported to act under Art. II, § 18 which states:

> "The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for an injury to a person or property, except as may be specifically provided by a 2/3 vote of each house of the legislature."

However, Art. II, § 16 of the State Constitution gives a constitutional right of full legal redress for injury. That section of the state constitution provides:

> "Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of <u>this full legal redress</u> for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such an immediate employer provides coverage under Workman's Compensation Laws of this state. . ."

The use of the clause "this full legal redress" has major significance. It obviously and grammatically refers to the "speedy remedy afforded for every injury of person, property, or character." The adjective "this" means the

- 15 -

person, thing, or idea that is present or near in place, time or thought or that has just been mentioned. Webster's New Collegiate Dictionary (1981). The constitutional framers thus construed a "speedy remedy" as comprehending "full legal redress." A state constitutional right to full legal redress was thereby created. Any state statute that restricts, limits, or modifies full legal redress for injury to person, property or character therefore affects a fundamental right and the state must show a compelling state interest if it is to sustain the constitutional validity of the statute.

In enacting § 2-9-107 the legislature made findings which the state contends establish a compelling state interest. It contends that constitutionality must be presumed, that all facts necessary to sustain the statute must be taken as conclusively found by the legislature, that the correctness of the findings is conclusive unless an abuse of discretion can be shown and that courts do not have jurisdiction or power to reopen, correct or make new findings of fact.

We have shown above that the state constitution provides a speedy judicial remedy for every injury of person, property or character, and that such speedy remedy includes a full legal redress as a fundamental interest. Since a fundamental interest is involved, § 2-9-107, MCA, must be subjected to strict judicial scrutiny in determining whether it complies with our state equal protection provisions and other provisions of our State Constitution. Under this standard the presumption of constitutionality normally attaching to the state legislative classifications falls away and the State must shoulder the burden of establishing that the classification in question is necessary to achieve a

compelling state interest. <u>Serrano</u>, supra, 557 P.2d at 952; Washakie Co. Sch. Dist. No. One v. Herschler, supra.

We set out here in full the legislative findings codified in § 2-9-106, MCA. On these the State relies to sustain the validity of § 2-9-107:

> "2-9-106. <u>Legislative findings</u>. (1) The legislature recognizes and reaffirms the report of the subcommittee on judiciary, contained in the interim study on limitations on the waiver of sovereign immunity (December 1976), that unlimited liability of the state and local governments for civil damages makes it increasingly difficult if not impossible for governments to purchase adequate insurance coverage at reasonable costs.
>
> "(2) The legislature finds that the obligations imposed upon governmental entities must be performed, even though the risks inherent in performing absolute obligations are great. The responsibility for confining, housing, and rehabilitation of persons convicted of criminal activity; the treatment and supervision of mental patients at government institutions or under government programs; the planning, construction, and maintenance of thousands of miles of highways; the operation of municipal transportation systems and airport terminals; and the operation and maintenance of schools, playgrounds, and athletic facilities are only a few of those obligations.
>
> "(3) The legislature finds that there are many functions and services both governmental and proprietary in nature traditionally offered by the state and other governmental entities which, because of the size of government operations and the inherent nature of certain functions and services, entail a potential for civil liability for tortious conduct far beyond the potential for liability of corporations and other persons in the private sector. Despite this potential for liability unparalleled in the private sector, the legislature finds that these functions of government are necessary components of modern life and that, despite limited resources and competition for those resources between necessary programs and entities, all functions and services both governmental and proprietary in nature are deserving of conscious and deliberate continuation or retirement by the people through their elected representatives. The legislature further finds that liability for damages resulting from tortious conduct by a government or its employees is more than a cost of doing business and has an effect upon government far beyond a simple reduction in

- 17 -

governmental revenues.  Unlimited liability would, because of the requirement for a balanced state budget contained in Article VIII, section 9, of the Montana constitution and because bankruptcy is a remedy unavailable to the state and most other governmental entities, result initially in increased taxes to pay judgments for damages and would eventually have the effect of reallocating state resources to a degree that would result in involuntary choices between critical state and local programs.  The legislature finds these potential results of unlimited liability for tort damages to be unacceptable and further finds that, given the realities of modern government and the litigiousness of our society, there is no practical way of completely preventing tortious injury by and tort damages against the state and other governmental entities.  The legislature therefore expressly finds that forced reduction in critical governmental services that could result from unlimited liability of the state and other governmental entities for damages resulting from tortious conduct of those governments and their employees constitutes a compelling state interest requiring the application of the limitations on liability and damages provided in parts 1 through 3 of this chapter."

Bearing in mind that in White v. State, supra, we upheld the provisions of § 2-9-105, MCA, to the effect that state and political entities are immune from awards of punitive damages, we find little more in the quoted legislative findings supporting § 2-9-107 than a legislative plea not to require the legislature and other political entities to provide the funds necessary to pay the just obligations of those entities.  In White, we also stated that the payment of tort judgments by political entities was simply a cost of doing business.  661 P.2d at 1275, 40 St.Rep. 510.  The legislature in its findings contends that paying a judgment is more than the cost of doing business, and would, because of the constitutional requirements of a balanced state budget "result initially in increased taxes to pay judgments for damages and would eventually have the effect of reallocating state resources to a degree that would result in involuntary choices between critical state and local programs."  Section

- 18 -

2-9-106, MCA. That statement is so wild in speculation as to be on its face unacceptable. Having to provide funds to pay judgments is not a sufficient excuse logically or legally. The legislature would place the burden of catastrophic damages not on the State whose agent caused them, but on the unfortunate person who received them. If the state constitutional framers in 1972 were concerned with any particular subject, they were certainly concerned with the importance of the individual. They detailed important individual rights in 35 sections of Art. II of the State Constitution, being careful to provide in § 34 that the specific enumeration of rights did not "deny, impair, or disparage other rights retained by the people." The findings of the legislature denigrate the right of the individual to full legal redress in favor of not raising taxes. Such a concept does not constitute either an acceptable or a compelling state interest.

As we analyze § 2-9-107, MCA, we find little difference between it and the statute we found invalid in White, that prohibited recovery against governmental entities for noneconomic damages. Section 2-9-107, permits some recovery from noneconomic damages, but limits the amount that can be recovered. In legal effect, § 2-9-107, is but § 2-9-104 in another guise. In each case the injured party suffers a restriction of his right to full legal redress. Our decision in White therefore controls the outcome of this case--the legislature has invaded a fundamental right granted to individuals, and it has not shown a compelling state interest for doing so.

In addition to the necessity that the State show a compelling state interest for an invasion of a fundamental

right, the state, to sustain the validity of such invasion, must also show that the choice of legislative action is the least onerous path that can be taken to achieve the state objective. Washakie County, supra. Here the state has not attempted to make any such showing.

We see no substance in the State's contention, echoed in the legislative findings, that limitations on damages against governmental entities are necessary because the functions and services of such entities "entail a potential for civil liability for tortious conduct far beyond the potential for liability of corporations and other persons in the private sector." Section 2-9-106, MCA. There is no foundation in fact for such a statement. The federal government carries on governmental functions and services immensely greater in complexity and more far flung, yet it provides redress for victims of federal government torts under the Federal Tort Claims Act. See 28 U.S.C. § 2674. Several large corporations in this state carry on their business functions and activities, and respond in full in damages, both compensatory and punitive, as part of their cost of business. It is a novel argument indeed for a party to complain that it is too big and complex, or its employees too poorly trained and unchecked, for the party to be able to respond in damages for its tortious acts.

Both the State and the County in this case centered their arguments on the proposition that there was no fundamental interest involved in this case and therefore the State had only to meet the test of a rational nexus between the legislation and the state objective in enacting the legislation. Under the record in this case, we doubt that the legislation could pass even the lenient rational basis

test but we do not reach that argument here. Since a fundamental interest is involved, we have examined the case from the viewpoint that the legislation requires strict judicial scrutiny to be sustained under our State Constitution.

Further argument advanced by both the State and the county is that since the amendment to the immunity clause in the State Constitution, adopted by a referendum vote of the people, empowers the legislature to fix immunity limits by a two thirds vote of each house of the legislature, that power is in effect part of the constitution itself and not subject to challenge.

We reject out of hand that the legislature has the power, under Art. II, § 18, as amended, to act under that amended clause without regard to other provisions of the State Constitution. We agree with the rationale of the California Supreme Court in Serrano, supra, where it said:

> "It seems to be argued, however, that because article XXIII, section 21 authorizes the financing of schools by a county levy of school district taxes, the Legislature is free to structure a system based upon this mechanism in any way that it chooses. Such a notion, we hasten to point out is manifestly absurd. A constitutional provision creating the duty and power to legislate in a particular area always remains subject to general constitutional requirements governing all legislation unless the intent of the Constitution to exempt it from such requirements plainly appears." 557 P.2d at 956.

We do not reach, because it is not necessary here, whether the grant to the legislature under the amended version of Art. II, § 18, is an impermissible grant to the legislature to amend the constitution.

The grounds upon which we hold today that § 2-9-107 is unconstitutional are somewhat different from those grounds utilized by the District Court in this case. The result, however, must be the same under our examination of the statute. We therefore hold that § 2-9-107, MCA, is an unconstitutional invasion by the legislature on a fundamental right granted under the State Constitution to sue governmental entities for full legal redress.

In view of our decision, it is not necessary to discuss other issues raised by the parties. The judgment of the District Court is affirmed.

_John C. Sheehy_
Justice

We Concur:

_____
Chief Justice

_____

_____

Mr. Justice Frank B. Morrison, Jr., specially concurs as follows:

I unequivocally concur in the constitutional analysis engaged by my learned brother, Justice John C. Sheehy, speaking for the majority. This specially concurring opinion is written for the purpose of addressing the dissents of Mr. Chief Justice J. A. Turnage and Mr. Justice Fred J. Weber.

The Chief Justice has filed a dissent in which he states:

> The majority opinion centers upon Article II, Section 16, of the Montana of the 1972 Montana Constitution . . .

The Chief Justice's dissent fails to grasp the constitutional issue in this case and therefore proceeds upon a faulty premise. The issue is whether the statute in question offends Art. II, Sec. 4, of our State Constitution which provides in part that "no person shall be denied the equal protection of the laws."

Had the courthouse door been completely closed to Pfost, then Art. II, Sec. 16, which forms the core of the Chief Justice's dissent, would likely be addressed rather than equal protection. The statute here in question does not institute a State immunity but rather provides a scheme for compensating litigants where a limited recovery of $300,000 is afforded. Pfost argues that such a scheme discriminates against him and denies equal protection of the law. Pfost's argument has not been addressed by the Chief Justice's dissent.

The first step in properly analyzing the Pfost claim is to determine whether the legislation discriminates. Pfost argues that people with claims worth less than $300,000 are

23

fully compensated but under the statutory limitation he receives practically nothing. Pfost is a quadriplegic. The $300,000 limitation will not pay the medical expenses for his lifetime. The result of the limitation is that Pfost will receive nothing for loss of income, destruction of his established course of life, or for physical pain and mental anguish.

The statute is facially neutral in that every one receives the same treatment. All tort victims are limited to $300,000 in claims against the State of Montana. However, the statute does have a disparate impact upon people such as Pfost who suffered catastrophic injuries. The tort victim who fractures a leg receives full compensation. On the other hand a quadriplegic, under the limitation imposed, would not recoup medical expenses and would be denied any compensation for the other aspects of injury.

In view of the disparate impact suffered by catastrophically injured tort victims, it seems clear that Pfost, and those similarly situated, suffer discrimination under the State limitation. However, discrimination in this case is not per se unconstitutional. The next step in equal protection analysis is to determine whether the discriminatory legislation can be sanctioned without denying equal protection of the law as it is guaranteed under our state constitution. In making that determination, we must decide what level of scrutiny attaches.

Equal protection analysis is usually accomplished by appellate courts through judging the legislative classifications using "rationale basis" or "strict scrutiny." Some courts have engaged a middle tier analysis. In this case we have adopted the "strict scrutiny" test for the

24

reason that a fundamental right is implicated in imposing a $300,000 limitation.

There is no claim in this case that the $300,000 limitation imposed by the legislature violates Art. II, Sec. 16, of the State Constitution. For that reason the dissent filed by the Chief Justice just misses the mark.

The only relevance of Art. II, Sec. 16, is in determining what level of scrutiny to attach in making an equal protection analysis. We must determine whether the $300,000 limitation infringes upon rights addressed in Art. II, Sec. 16. If so, then in making an equal protection analysis, strict scrutiny attaches and the State must show a compelling State interest in justification of the limitation.

In White v. State of Montana (Mont. 1983), 661 P.2d 1272, 40 St.Rep. 507, this Court held that Art. II, Sec. 16, afforded redress for all aspects of injury including pain and suffering and that the State Tort Claims Law, which denied compensation for pain and suffering, would be subjected to a strict scrutiny analysis.

Art. II, Sec. 16, provides in relevant part as follows:

Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress . . .

In White we determined that the language "every injury" included pain and suffering and that by denying any compensation for pain and suffering the State would be required to show there was a compelling State interest to justify the denial. In this case, at least arguably, there is some compensation for every injury. On the face of the statute one can recover for all legally cognizable elements of damage but there is a $300,000 cap. The majority has

25

attempted to determine whether such a limitation affords a speedy remedy for every injury as that language was intended in Art. II, Sec. 16. We looked to the next sentence in the section which commences "no person shall be deprived of this full legal redress . . ." The word "this" clearly refers to an antecedent. When the language of the section is construed harmoniously, it appears clear that the constitutional delegates intended that "remedy afforded for every injury" provides for full legal redress. That intent is made abundantly clear by the language of delegate DaHood quoted in the Chief Justice's dissent. DaHood said:

> We say, in the first sentence, that every citizen shall have the right to full legal redress.

Montana Constitutional Convention Transcript, Vol. V at 1757.

The first sentence of Section 16 does not specifically state that full legal redress is afforded, but the language found in the next sentence, shows the full breath of the first sentence's command.

Once we have determined that the $300,000 limitation discriminates against a class including the claimant Pfost and that such discrimination implicates a fundamental right found in Art. II, Sec. 16, we then require the State to justify the limitation by showing a compelling State interest. In White v. State, supra, we clearly stated that saving money did not constitute a compelling State interest. As in White, no compelling State interest has here been shown. Therefore, the statute in question fails to pass constitutional muster and must be stricken. The Chief Justice, in not addressing the equal protection issue, leaves us in the dark about whether he would apply a rational basis

26

test or a middle tier analysis. He does not say if the present statute would pass either test, and if so, why.

Justice Weber argues that Art. II, Sec. 18, has application in this case. That section states:

> State subject to suit. The State, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specially provided by law by a two thirds vote of each house of the legislature.

Under this provision of the Constitution, the legislature is authorized to enact State immunity by a two thirds vote. Of course, the legislature could do that anyway. The legislature could immunize any person or group of people from tort liability. The only significance of this constitutional provision is that it requires a two thirds vote instead of a majority vote in order to immunize the State of Montana from liability.

Where Justice Weber's dissent goes astray is in failing to consider that any legislation passed by the legislature must be subjected to the other provisions of the Constitution. Certainly the legislation itself does not become a part of the Constitution and therefore cannot be balanced against other constitutional provisions. If the legislation passed by the legislature violates the equal protection clause of the Constitution, it still must be stricken.

I believe the majority opinion is scholarly and constitutionally sound. However, that opinion was drafted prior to the drafting of the dissents. The purpose of this concurring opinion is to show the weaknesses in the dissents and reinforce the lucid analysis found in the majority opinion.

_____
Justice

27

Mr. Chief Justice J. A. Turnage dissenting:

I dissent to the majority opinion. I would hold that § 2-9-107, MCA, is constitutional and reverse the District Court.

The majority opinion centers upon Article II, Section 16, of the 1972 Montana Constitution and its application as articulated in White v. State of Montana (Mont. 1983), 661 P.2d 1272, 40 St.Rep. 507.

This Court should reexamine its interpretation of Article II, Section 16.

Montana's 1889 Constitution, Article III, Section 6, provided:

> Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character; and that right and justice shall be administered without sale, denial, or delay.

Montana's 1972 Constitution, Article II, Section 16, provides:

> Courts of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state. Right and justice shall be administered without sale, denial, or delay.

The first and third sentence of Article II, Section 16, with the exception of the omission of the adjective "a" in the first sentence, are identical to the 1889 Constitution, Article III, Section 6. The drafters of the 1972 Constitution added only the second sentence of Article II, Section 16:

28

> No person shall be deprived of this full
> legal redress for injury incurred in
> employment for which another person may
> be liable except as to fellow employees
> and his immediate employer who hired him
> if such immediate employer provides
> coverage under the Workmen's Compensa-
> tion Laws of this state.

A careful examination into the intent of the drafters of the 1972 Constitution is essential and critical to this Court's correct interpretation of the second sentence of Article II, Section 16. Evidence of their intent is to be found in official proceedings of the Constitutional Convention.

The second sentence of Article II, Section 16, first appeared at the 1972 Constitutional Convention as delegate proposal 133 introduced February 3, 1972, and now appears verbatim as introduced in our Constitution. The proceedings of the delegates to the 1972 Constitutional Convention relating to the amendment of Article III, Section 6, of the 1889 Constitution by the addition of the second sentence in what is now Article II, Section 16, clearly establishes that the delegates had a singular and sole purpose in this regard: To assure that no person shall be deprived of full legal redress for injury incurred in employment for which another person may be liable.

Examination of the proceedings of the Montana Constitutional Convention from January 17, 1972, to March 24, 1972, leaves no doubt as to the delegates' purpose and intent in Article II, Section 16, nor does the plain language of this Article and Section.

On February 22, 1972, the Bill of Rights Committee submitted a committee report with these comments:

> The committee voted unanimously to
> retain this section with one addition.

The provision as it stands in the present Constitution guarantees justice and a speedy remedy for all without sale, denial or delay. The committee felt, in light of a recent interpretation of the Workmen's Compensation Law, that this remedy needed to be explicitly guaranteed to persons who may be employed by one covered by Workmen's Compensation to work on the facilities of another. Under Montana law, as announced in the recent decision of Ashcraft v. Montana Power Co., the employee has no redress against third parties for injuries caused by them if his immediate employer is covered under the Workmen's Compensation Law. The committee feels that this violates the spirit of the guarantee of a speedy remedy for all injuries of person, property or character. It is this specific denial--and this one only--that the committee intends to alter with the following additional wording: "no person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state." In other words the committee wants to insure that the Workmen's Compensation Laws of the state will be used for their original purpose--to provide compensation to injured workmen--rather than to deprive an injured worker of redress against negligent third parties (beyond his employer and fellow employees) because his immediate employer is covered by Workmen's Compensation. The committee believes that clarifying this remedy would have a salutary effect on the conscientiousness of persons who may contract out work to be done on their premises. To permit no remedy against third parties in cases where the employer is covered by Workmen's Compensation is to encourage persons with rundown premises to contract out work without improving the quality of the premises. The committee urges that this is an abuse of the Workmen's Compensation Law and constitutes a mis-application of that law to protect persons who are negligent.

The committee commends this provision to the convention with the belief that it

30

> is an important, if technical, aspect of
> the administration of justice.

Montana Constitutional Convention, Vol. II, at 636-367.

On March 8, 1972, the Convention resolved itself into a Committee of the Whole and delegate Murray in recommending Section 16 of Article II stated:

> DELEGATE MURRAY: [After reading the entirety of the above committee report.] Those are the remarks which are contained in the booklet. Let me amplify them by saying basically this: we feel that the right to third party action is a right which we should establish in our Constitution. It is a right which working men and women who are unfortunate enough to be injured have had for nearly 80 years in this state. We feel that it was wrongly taken away from these people by the Supreme Court decision which was mentioned. We feel that we perhaps are legislating in asking that this be written into our Constitution, but we of the committee really believe that we are acting in a judicial manner in asking that it be written in the Constitution for we feel that this Convention, perhaps, is the court of last resort for injured working men and women in Montana with respect to the third party lawsuit, and we recommend that the section be adopted.
>
> CHAIRMAN GRAYBILL: Mrs. Bowman.
>
> DELEGATE BOWMAN: Mr. Chairman, I wonder if Mr. Murray would yield to a question.
>
> CHAIRMAN GRAYBILL: Mr. Murray, will you yield?
>
> DELEGATE MURRAY: Yes, Mr. Chairman.
>
> DELEGATE BOWMAN: Mr. Murray, I don't understand what this means and I wonder if you would explain it, giving us a specific example of what happened so we'd know that you're taking about.
>
> DELEGATE MURRAY: Mrs. Bowman, in the case in question, the--one of the important utilities in this state hired a contractor to repair some of its powerlines and the employee of the contractor that was hired crawled up a power pole and, while there working on that pole, it broke and it fell with him

31

to the ground and he was injured. In the case in question, because of the decision of the Supreme Court, the injured employee was limited to Workmen's Compensation benefits through the coverage of the contractor. Ordinarily, if it were not for this interpretation, the injured employee would be entitled to sue the important utility in this state and recover in addition to his Workmen's Compensation benefits. Those benefits or a portion of those benefits recovered under Workmen's Compensation, were the injured workman--did he--or were he to make a recovery against the important utility, would be paid back under the theory of subrogation to the Industrial Accident Fund of Montana. But does that explain basically what occurred, at least in this one instance?

Montana Constitutional Convention, Vol. V, at 1753-1754.

Delegate Dahood stated:

DELEGATE DAHOOD: Mr. Chairman, I had intended not to speak on this particular section simply because I was trial counsel on behalf of Charles Ashcraft, who is permanently disabled for the rest of his life and shall never work at his trade. I have heard this argument in the Supreme Court, an argument that had no basis in logic. I have heard it by several defense counsel who represent the best of corporate interests, that this is going to affect the individual property owner, and if he hires a contractor, he is going to be exposed to a liability that is unprecedented and they did not experience before. This is totally untrue. This section is doing nothing more, and the wording has been very precisely selected to make sure that it does nothing more, than place the injured working man back in the status that he enjoyed prior to 1971, a very basic constitutional right which he enjoyed for 80 years in the State of Montana. What happened in the Ashcraft case? The Montana Trial Lawyers Association, 150 members strong, to a man, without a dissent, believes that this Constitutional Convention must return this right to the injured working man. The unions, without exception, believe that a very basic right has been taken away from the injured working man in the State of Montana, and I understand that the corporate interest that specifically are involved in this have decided that

they will not ask anyone to offer opposition to it on the Convention floor. Here is what happened in the Ashcraft case. Charles Ashcraft worked for an independent contractor having no connection with the Montana Power Company. The Montana Power Company made what we call an independent contract to have a new phase placed upon their power poles. Charles Ashcraft went 35 feet into the air. He was there for 20 minutes. Without warning, without any chance to protect himself, that pole gave way below ground level and carried Charles Ashcraft 35 feet to the ground. He was 90-some days in the hospital, but he survived; but he will not work at his trade again. What were the real facts? And keep this in mind: we are only talking about a situation where someone, through negligence, through a failure to use due care, has brought about the injury. There is nothing automatic. You may still suffer injury that is not fault of anyone else--not recover. We are not talking about that. So what were the facts? Dr. Clancy Gordon, one of the environmental advocates, was retained by us. He is a professor of botany at the University of Montana. He examined the pole and found several apparent things about it. One, it violated the statute of the State of Montana that's been on the statute books for more than 50 years, that power companies must construct their poles of cedar-quality or other standardized material. This was a lodgepole pine; it was not as required by statute. This was a lodgepole pine that has a useful life of from 17 to 20 years at the most. This pole had been in place for more than 23 years and had not been inspected for more than 5 years before the accident occurred. As a consequence, the rotting that took place took place below the ground level where the lineman, before climbing the pole, could not detect it, even though in this instance Charles Ashcraft did what he was trained to do--took a shovel and dug around the base of the pole. And as a consequence, through the negligence of the Montana Power Company, he suffered this permanent injury. Up until this decision by the Supreme Court, there was no question that in that situation the injured citizen, the injured working man had a right for proper redress. The Workmen's Compensation law, which is inadequate at best, has certain public reasons for its

existence. It applies only between the employer and the employee. So clever legal counsel for the Montana Power Company, and very able, decided maybe there's some way to get away from this case. So they went back to 1965, when the Legislature amended the independent contractor law to provide that you no longer could defend on the ground that someone injured within your work premises was not entitled to Workmen's Compensation from you because he was employed by an independent contractor unless you insisted that that independent contractor carry Workmen's Compensation. The legislators that were behind that amendment were interviewed. They said, "We had no intention whatsoever of bringing about the results that were brought about by this Supreme Court decision, and you have to strain the reading of that particular section to come up with that particular position." But nevertheless, the Supreme Court--and there's a very bitter dissent on that case--a long and well-reasoned dissent--but in any event, in that case they fastened upon that as a justification and an excuse for denying this working man his remedy. When that happened--and this was after Judge Battin of the Federal Court in a similar case had ruled in Montana that this amendment does not do that--he then had to change his mind, because under federal law, he's bound by a Montana decision. The legal community was shocked. None of us were able to explain the result to the unions, to the working people. This particular right was taken away from the working man after 80 years, so promptly legislators introduced in the Senate a bill to overcome that. It passed the Senate--and I don't want to make a bicameral or a unicameral argument here. (Laughter) Promptly the lobby of the vested corporate interests when across the hall--and we determined this to be true--and made sure that it did not pass in the House. So we're now at the court of last resort. We allowed in our Bill of rights an amendment to a clean and healthy environment. By this provision and this amendment, we are going to provide for the working man a safe environment. How does the law stand at the moment? Let me tell you how it stands. And some of the big vested corporate interests are now using independent contractors because it's reduced their cost of operation. If you have

some particular tough job that you want done on your premises where there may be some danger connected with it, what you do, you go out and you hire an independent contractor. Don't have your employees in that dangerous area, because if they're hurt or there's an accident, you have to pay them Workmen's Compensation. So here's the way you do it now that we have immunity from the Supreme Court--an immunity neither intended by the people nor intended by the Legislature. What you do, you hire someone on an independent contractor basis and their employees are in this dangerous area. You don't have to worry about safety anymore. You don't have to do anything to make your premises safe. You don't have to be concerned about a safe environment for the people that are working there to benefit your interest. If they're injured, even though it's the most blatant type of negligence and carelessness, all you have to say is, "Well, we're sorry, but you have your Workmen's Compensation." Maybe you have a wife and seven children, but it's $65 a week for awhile and it's 60, and now, of course, the Legislature has raised it and you can get more money, but that's it. The Workmen's Compensation people were astounded at the decision. They sent their lawyers up to petition for rehearing. I do not think that any strong legal mind could really and truly justify what had happened, which has resulted in this, that in a particular area of industry now we need not have a safe environment for the working man. The vested corporate interest has immunity without paying anything for it. Now, how does it work if we return this basic right that the injured working man had for 80 years? Simply this. Let's assume--let's take the Charles Ashcraft situation. Charles Ashcraft is injured. He proves all these factors about the negligence of the Montana Power Company. He is paid his Workmen's Compensation, so he files what the lawyers call a third party lawsuit. The Montana Power Company then is compelled to acknowledge its obligation. They make payment. He then pays back to the Workmen's Compensation carrier. We have a provision in Montana in the Workmen's Compensation Law that provides for these actions--that the working man doesn't bring it, the Industrial Accident Board does. That law has never been changed. But how about now? That law is almost

useless because of this particular interpretation. So what has happened? Regardless of all this conflict, this technicality, having to use the word "Workmen's Compensation" in this particular section, which we didn't want to do, because the minute we did it we knew that somebody would jump up and say it's legislative, but if you're going to draft something with precision and you want to make sure that all that you're doing is returning the law to what it was prior to this decision a year ago, you are compelled, sometimes, in fashioning this precise language to use language that may be seized upon by someone else as legislative. It is not. It is giving back a basic constitutional right that the citizen of Montana had prior to that particular decision. And we submit to you that by this particular provision, all that we are doing is returning that right to the working man; and how can anyone truly, justly object to doing that and only that? Now that is what happened in that particular situation. This is a constitutional provision. We say, in the first sentence, that every citizen shall have the right to full legal redress. We've taken away full legal redress in that particular area. We want to give full legal redress back in that one specific area, and that is why it is framed in that particular fashion. And we submit to you, our fellow delegates, that we are here to make sure that the rights of the citizen are protected, and this is nothing more than a step forward to make sure that they will continue to have a protection that existed for 80 years. We submit it's a constitutional matter and that the amendment is required to have a progressive Bill of Rights. Thank you, Mr. Chairman.

Montana Constitutional Convention, Vol. V, at 1755-1757.

Delegate Johnson then inquired of Delegate Dahood:

DELEGATE JOHNSON: Wade, I'm a cattle rancher down in southeastern Montana and we live way back in the hills, off the road. We have to maintain our own road; in fact, it's 12 miles there. We built what kind of a road we have, and we try to get by on it. We have some homemade bridges there, and this and that. As a point of clarification, I wanted to ask you, where we would contract somebody to do some work on this road and perhaps

one of them with a piece of heavy equipment were doing some shaling or graveling of this or that and one of these bridges would collapse and one of those men would be hurt, then I would be responsible?

DELEGATE DAHOOD: Torrey, you would not be responsible. This amendment does nothing more than return the law to what it was about a year ago. Please recall what I said. The only time that someone would be responsible, such as the Montana Power Company, is when they are negligent, they are guilty of some type of civil wrongdoing. And this other argument that's been used, that it's going to open you up or it's going to open the owner of a residence up to some type of lawsuit, is simply, absolutely not true. That's why we fashioned this language precisely as we have. We're doing nothing more than trying to return the law to what it was prior to a year ago. Your situation would be no different that it's been in all the years gone by, Torrey.

Montana Constitutional Convention, Vol. V, at 1758.

In the clear and bright light of this record, there should be no reason for disagreement on what the intention of the Constitutional Convention delegates was and what they had in mind when they adopted Article II, Section 16, or what the citizens understood when they voted upon this provision.

The majority opinion in its interpretation of Article II, Section 18, of the Montana Constitution and of § 2-9-107, MCA, raises other, and perhaps more serious, constitutional questions.

What political power do the people have to amend their Constitution? What standing with relation to other constitutional articles does a subsequent constitutional amendment have? What power do the people have to respond to any amendment through their Legislature?

Article II, Section 1, provides:

> All political power is vested in and
> derived from the people. All government
> of right originates with the people, is
> founded upon their will only, and is
> instituted solely for the good of the
> whole.

Article II, Section 2, provides:

> The people have the exclusive right of
> governing themselves as a free, sover-
> eign, and independent state. They may
> alter or abolish the constitution and
> form of government whenever they deem it
> necessary.

Article III, Section 1, provides:

> The power of the government of this
> state is divided into three distinct
> branches--legislative, executive, and
> judicial. No person or persons charged
> with the exercise of power properly
> belonging to one branch shall exercise
> any power properly belonging to either
> of the others except as in this consti-
> tution expressly directed or permitted.

The 1972 Constitution, when adopted by the people, was an amendment to their 1889 Constitution, and there should be no dispute that amendments to the Constitution must and do have a direct effect upon any prior existing Article of the Constitution which the amendment has an obvious and intended purpose in addressing. To hold otherwise may render any attempt by the people to amend their Constitution a nullity.

In a given factual context, each Article of our Constitution must have equal and recognized standing. If such were not the case, and the document not read to harmonize each of its provisions, interpretive chaos may well result.

Amendments amend amendments and this must be recognized by the Court.

The original Article II, Section 18, of the 1972 Constitution provided:

> The state, counties, cities, towns, and
> all other local governmental entities
> shall have no immunity from suit for

injury to a person or property. This
provision shall apply only to causes of
action arising after July 1, 1973.

An amendment to this Section was presented to the people by legislative referendum and in 1974 the people amended Article II, Section 18, which now provides:

The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature.

In 1983, the legislature in response to this Court's decision in White, adopted § 2-9-107, MCA:

(1) Neither the state, a county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for damages suffered as a result of an act or omission of an officer, agent or employee of that entity in excess of $300,000 for each claim and $1 million for each occurrence.

(2) No insurer is liable for excess damages unless such insurer specifically agrees by written endorsement to provide coverage to the governmental agency involved in amounts in excess of a limitation stated in this section, in which case the insurer may not claim the benefits of the limitation specifically waived.

The majority of this Court now finds this statute invalid and unconstitutional in failing to meet a test of rationality or compelling State interest, and therefor discriminatory, and therefor a denial of equal protection under Article II, Section 4, of the Montana Constitution.

I believe § 2-9-107, MCA, meets the test of rationality and compelling State interest.

The majority opinion sets forth in full the provisions of § 2-9-106, MCA, which will not be repeated here, but I commend the reader to further consider its provisions. They

39

are not mere bare assertions or only a legislative plea not to require government to provide funds. They are carefully considered and articulated reasons why government of the people must be protected from unlimited liability.

The result of the majority opinion not only affects the State government, which arguably may have a deep pocket, but every County, City, School District, Irrigation District, Fire District, and many other small governmental entities as well, which unarguably do not have a deep pocket. It is the people of this State, not government, who bear the cost of government, which of course is extracted from them by taxes and fees.

When the people in 1974 adopted Article II, Section 18, they authorized the legislature to specifically provide immunity from suit to governmental entities for injury to persons or property. This is precisely what the legislature has done in 1983 by passing § 2-9-107, MCA. They did not provide for total immunity but specifically limited damages as to amount. Legal redress for injury to person or property can only be measured in money damages. Article II, Section 18, authorizes the legislature to provide for this limited immunity.

The majority opinion cites White and Article II, Section 16, for the proposition that there is a fundamental right to full legal redress under the facts of this case.

A grammatical reading of Article II, Section 16, does not support this interpretation.

The clear intent of the 1972 delegates to the Constitutional Convention does not support this interpretation.

In adopting the second sentence of Article II, Section 16, they intended and did provide full legal redress for

injury incurred in employment for which others may be liable, except as to fellow employees and the immediate employer. There is no question as to the need for this protection for the employees in this State.

There further can be no question that our courts are open to every person and speedy remedy afforded for every injury of person, property or character; however, this does not mean that the people have been denied the right to act through their legislature in providing a system of law that may set forth the scope and extent of the remedies provided by law. For this Court to decide otherwise requires a denial of the doctrine of separation of powers in Article III, Section 1, of the Montana Constitution.

This Court should reexamine its interpretation of Article II, Section 16, articulated in White and the cases controlled by that decision.

Chief Justice

41

Mr. Justice Fred J. Weber dissents as follows:

I commend the majority for its historical analysis and careful presentation of the constitutional principles which apply in equal protection cases. However, I strongly disagree with the conclusion that, under the facts of this case, there is a fundamental right to full legal redress which has been offended. I concur in the dissent of Chief Justice Turnage and agree that this Court should re-examine its interpretation of Art. II, § 16, Mont. Const. 1972, as contained in White and the majority opinion here.

I

Article II, § 18, Mont. Const. 1972, provides:

> The state, counties, cities, towns, and all other governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by 2/3 vote of each house of the legislature. [Emphasis supplied.]

The underscored portion was added by a constitutional amendment and approved by referendum vote of the people in 1974. As pointed out in the majority opinion, prior to that amendment, the state and various governmental entities had no immunity from suit under the 1972 Constitution. The constitutional referendum added the exception.

It is apparent that the people intended that the state could make specific provisions for immunity so long as those provisions were adopted by a 2/3 vote of each house. By requiring the 2/3 vote rather than the normal majority vote, the people demonstrated their requirement for broad agreement as to any immunity adopted.

Section 2-9-107, MCA, was adopted by 2/3 vote of each house of the legislature and was also approved by the governor. The adoption of that statute appears to satisfy the

42

requirements for immunity under Art. II, § 18, Mont. Const. 1972.  However, White and Pfost hold that no such immunity exists.

White held unconstitutional § 2-9-107, MCA 1983, which limited recovery to economic damages and eliminated the right to recover other types of damages from the state.  White thereby advised the people of Montana, the members of the legislature and the governor, in particular, that they could not provide for immunity under section 18 by limiting recovery to certain types of damages or components of injury.

The majority opinion in Pfost now tells the people, members of the legislature and the governor that they cannot adopt a statute that in any way limits the dollar amount of recovery from the State as legal redress for injury to person, property or character.

If limited sovereign immunity is to be granted, it requires either a limitation on the type of damages for which compensation can be paid, or a dollar limitation upon the total amount of recovery.  Both of these alternatives have now been effectively eliminated by the opinions of this Court.  Absolute immunity appears to be the only remaining alternative.  However, whether a statute that grants total sovereign immunity would still be permissible is an unsettled question.  The effect of White and Pfost appears to be an improper judicial repeal of the exception in Art. II, § 18, Mont. Const., as adopted by the people of Montana in 1974.

II

Art. III, § 6 of the 1889 Montana Constitution provided that courts of justice "shall be open to every person, and a speedy remedy afforded for every injury of person, property or character. . ."  This is substantially the same provision as Art. II, § 16 of the 1972 Montana Constitution.

43

The majority points out that prior to adoption of the 1972 constitution, the State and its agents enjoyed total immunity from suit for tort action unless a policy of liability insurance existed. If the rationale of the majority in this case were applied, such total immunity would have been constitutionally improper. In a similar manner, the statutory reference to liability insurance, under which a court could reduce any judgment to a figure within the limits of insurance coverage, would also have been improper. Certainly the reduction of a judgment to the amount of available insurance would be unconstitutional under the majority analysis in the present case.

I point briefly to our constitutional history in order to emphasize how the majority's conclusion suggests that for many years prior to White, the thinking on the part of this Court and the people of Montana was constitutionally off base. I disagree.

### III

What choices do the legislature and the people of Montana have in the event they desire to adopt immunity from suit, as authorized by Art. II, § 18, Mont. Const. 1972? Unfortunately I am not able to assist by giving any sense of direction. If I understand the thinking of the majority correctly, legislation which in any way restricts recovery of any damages claimed by an injured party would be impermissible. That seems to leave only one alternative: the adoption by a 2/3 vote of each house of a statute which grants total immunity to the state, counties, cities, towns and all other local governmental entities. If such a statute were enacted, it apparently could not contain any limitation with regard to insurance limits because of the holding in this case. Apparently absolute immunity adopted by a 2/3

44

vote of each house is the only choice that has not been rejected by this Court. I regret that this is the tragic choice which remains.

## IV

I find that Art. II, § 16, Mont. Const., must be compared to § 18 of that same article. The canons of constitutional construction to be applied in comparing two different provisions require that the constitution be considered as a whole, that all provisions bearing upon the same subject matter receive appropriate attention and be construed together, and that specific provisions control broad and general provisions. See Jones v. Judge (1978), 176 Mont. 251, 255, 577 P.2d 846, 849.

In construing the two constitutional provisions here, we note that the people of Montana properly adopted an exception. They amended Art. II, § 18 several years after they adopted § 16. We also note that § 16 is the broad and general provision guaranteeing access to the courts and a remedy for every injury. Section 18, on the other hand, is a specific provision allowing limitations on legal redress against the government. Section 2-9-107, MCA, was adopted in accordance with § 18. The result is that the various governmental entities became immune from damages in excess of $300,000 for each claimant and $1,000,000 for each occurrence. I conclude that § 2-9-107, MCA, is a constitutionally authorized limitation under Art. II, § 18 of the Constitution.

## V

Even if I were to accept the holding of <u>White</u> and apply the strict scrutiny test to the legislation as required by the majority here, I would not reach a conclusion that § 2-9-107, MCA, is unconstitutional. I find the extensive

legislative findings set forth in § 2-9-106, MCA, to be compelling. The legislature recognized that unlimited liability makes it increasingly difficult, if not impossible, to purchase insurance coverage. The legislature emphasized the high risk activities which must be performed by governmental entities and pointed out that all of such functions and services entail a potential for civil liability far beyond the potential liability of corporations or other persons in the private sector. The legislature further found that these functions are necessary components of government and that despite limited resources and competition for these resources between various programs, the services should be furnished to the people of this state. The legislature found that liability for damages for tort is more than a cost of doing business, and that its effect upon government goes far beyond a simple reduction in governmental revenues. The legislature concluded that unlimited liability would precipitate severe budget problems. Of particular significance are the following:

> . . . The legislature finds these potential results of unlimited liability for tort damages to be unacceptable and further finds that, given the realities of modern government and the litigiousness of our society, there is no practical way of completely preventing tortious injury by and tort damages against the state and other governmental entities. The legislature therefore expressly finds that forced reduction in critical governmental services that could result in unlimited liability of the state and other governmental entities . . . constitutes a compelling state interest requiring the application of the limitations on liability and damages provided in parts 1 through 3 of this chapter.

The governor concurred in these findings when he signed the legislation.

46

I find these legislative findings and statements of purpose to be a clear, understandable and cogent explanation for the conduct of the legislature and the governor in passing this bill. These findings express major policy decisions which are peculiarly within legislative competence. For example, the financial impact of abolishing the monetary limit on sovereign immunity is a matter which could be clarified by legislative hearings. That process is not available to this Court. Unlike the legislature, we have no way of studying the economic and social trade-offs which might be involved if the State is subjected to unlimited liability. I would hold that the legislative findings are sufficient to establish a compelling state interest. As a result, I would conclude that even under the equal protection analysis of the majority, § 2-9-107, MCA, is constitutional.

_____
Justice

Mr. Justice L. C. Gulbrandson:

I join in the dissents of Mr. Chief Justice Turnage and Mr. Justice Fred J. Weber.

_____
Justice